MICHIGAN CITIZENS FOR AN INDEPENDENT PRESS, et al., Appellants,

v.

Richard THORNBURGH, United States Attorney General, et al.

No. 88–5286.

United States Court of Appeals, District of Columbia Circuit.

Feb. 24, 1989.

ON APPELLANTS' SUGGESTION FOR REHEARING EN BANC

Before WALD, Chief Judge; ROBINSON, MIKVA, EDWARDS, RUTH B. GINSBURG, STARR, SILBERMAN, BUCKLEY, WILLIAMS, D.H. GINSBURG and SENTELLE, Circuit Judges.

ORDER

Appellants' Suggestion for Rehearing *En Banc* has been circulated to the full court. The taking of a vote was requested. Thereafter, a majority of the judges of the court in regular active service did not vote in favor of the suggestion. Upon consideration of the foregoing it is

ORDERED, by the court *en banc*, that the suggestion is denied. It is

FURTHER ORDERED, by the court *en banc*, on its own motion, that the stay of implementation of the joint operating agreement reimposed by the order of Feb-

---

ruary 2, 1989, shall remain in effect until 5:00 p.m. E.S.T. on March 6, 1989, to afford appellants an opportunity to apply to the Supreme Court for a stay beyond that date.

Chief Judge WALD and Circuit Judges MIKVA, HARRY T. EDWARDS and RUTH BADER GINSBURG would grant the suggestion for rehearing *en banc.*

A concurring statement of Circuit Judge SILBERMAN, joined by Circuit Judge SPOTTSWOOD W. ROBINSON, III, is attached.

A dissenting statement of Chief Judge WALD, joined by Circuit Judges MIKVA and HARRY T. EDWARDS, is attached.

Circuit Judges STARR and D.H. GINSBURG did not participate in this matter.

SILBERMAN, Circuit Judge, with whom SPOTTSWOOD W. ROBINSON, III, Circuit Judge, joins, concurring in the denial of rehearing en banc:

The Chief Judge offers two justifications to slip *Chevron*'s restraining leash. Neither is grounded on an actual construction of the statutory language (which she concedes is ambiguous) nor its legislative history. Instead, the Chief Judge first interposes a theoretical economic argument to challenge the reasonableness of the Attor-

ney General's interpretation of the statute. The Attorney General's conclusion that the Detroit Free Press is in "probable danger of financial failure" is unreasonable, we are told, because it is based on an economically unreasonable prediction—that the Detroit News is willing to continue to price below its costs in order to drive the Free Press to close its doors.[1] This is unreasonable because sophisticated firms do not—over a significant period of time—cut prices in order to drive a competitor out of the market, *unless* entry barriers prevent new competitors from emerging. If new competitors could emerge, the costs incurred in driving the old competitor out of the market would be wasted. *See Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 121 n. 17, 107 S.Ct. 484, 495 n. 17, 93 L.Ed.2d 427 (1986); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 589, 106 S.Ct. 1348, 1357, 89 L.Ed.2d 538 (1986).

I quite agree with that proposition. But I cannot see its relevance to this case. Congress obviously would not have passed the Newspaper Preservation Act unless it had perceived entry barriers that prevented an effective challenge to a monopoly newspaper. And, although it is not up to us to question Congress' judgment, surely we have seen nothing in this case to suggest Congress was misinformed. Whether those entry barriers, as a theoretical matter, are properly analyzed as due to a natural monopoly[2] or a variation on that classic

---

1. Or more accurately, the question is whether the Attorney General reasonably believed that the Detroit Free Press reasonably believes that the News will follow that course. In that event, as we said in our opinion, the Free Press' assertion that it will shut down if the JOA is denied is hardly incredible.

2. *See* C. Kaysen & D. Turner, *Antitrust Policy* 191 n. 1 (1971) ("There are disturbing indications that newspaper publishing is approaching this unhappy state [of natural monopoly] in many cities and towns."). The Attorney General never took a position on whether the Detroit market is a natural monopoly, and the passage on which the Chief Judge relies obviously fails to suggest that he did. *See* Statement of Chief Judge Wald, at 2 n. 2. The Attorney General simply said that "the *Free Press* plainly does not face external market forces—such as rising

costs, competition from other media outlets and the siphoning off of readers from the metropolitan region to the suburbs—that would portend almost certain failure." And his statement that "the Detroit market *could* sustain two profitable newspapers *if* both circulations and advertising prices were increased" is not really inconsistent with the possibility that the Detroit market is a natural monopoly. *See* P. Areeda & D. Turner, *Antitrust Law,* § 621, at 48 (In a natural monopoly market, "demand may be sufficient *at some price* fixed by law or cartel to cover the costs of more than one producer, but the cost of production will be significantly lower with a single producer."). The ALJ did say that "there is no convincing evidence that superior scale economies is [sic] likely to be determinative for the News," but it is by no means clear that it is only or chiefly scale economies that cause one-newspaper towns. That may be why the newspaper

economic theme (I am beginning to doubt that anyone truly understands the newspaper market) is beside the point. Congress authorized the Attorney General to prevent a city newspaper editorial monopoly—even at the risk of a shared economic monopoly —because it thought the unusual economics of the newspaper industry compelled that exception to the antitrust laws. Otherwise, one newspaper may achieve a stunning fusion of economic and editorial (political) power due to the loss of actual and potential competition. The Chief Judge's basic quarrel thus is with the premise of the statute itself.

Although the appellants did not present the theoretical gloss that the Chief Judge puts on their argument, they did rely—as does the Chief Judge—on the Attorney General's statement that hypothetically Detroit could support both papers. That would be so if—and this is a big if—both papers raised their prices. The Attorney General, however, never predicted how long that hypothetical situation would last or how it might be enforced.[3] There is the rub. As Congress realized, see S.Rep. No. 535, 91st Cong., 1st Sess. 2–4 (1969), one of the competing newspapers in any American city seems all too often to achieve a dominant position, which means that a newspaper owner who holds an advantage in a two newspaper city might be irrational if he did *not* attempt to drive his competitor out of business. Otherwise, he might wake up one day to realize that he had lost the superior position and was already himself in the downward spiral. In other words, an unregulated long-term two newspaper com-

petitive equilibrium may well be a rarity (if not a chimera), and surely no newspaper owner in such a market can be confident that he and his competitor are in that exceptional city. *See* 116 Cong.Rec. 1788 (1970) (Statement of Sen. Fong) ("[I]t [is] increasingly difficult for many newspapers to coexist in the same community under conditions of all-out economic competition."). Accordingly, the ALJ found that the "strategies pursued by the Free Press and News ... were perceived by management as economically rational given the history of the demise of junior papers which had entered the downward spiral." ALJ Report, at 112–13. Even if the Detroit market was an exception to the prevailing pattern, the News (and the Free Press) could not possibly know that, and therefore neither paper would rationally gamble on such an assumption.

I do not see, in short, how the Chief Judge's interposition of economic theory supports her contention that the Attorney General's construction of the statute or his prediction as to the Detroit News' behavior is unreasonable.

Chief Judge Wald's second contention (inconsistent with her first) assumes that it *would* be reasonable for the News to continue to price below cost in order to drive the Free Press out of business, but argues that such behavior constitutes illegal predation—or something "perilously close" to illegal predation. The difficulty with this argument, no matter how couched, is not only was it not raised by appellant in this court,[4] it was not raised by any party—in-

---

market is so puzzling.

**3.** The ALJ did quote the management of the Free Press as saying that the paper could become profitable if "competitive pricing becomes rational and consistent with other markets around the country." *See* Statement of Chief Judge Wald, at 1. But, as we explained in our opinion, all the Attorney General said was that some hypothetical pricing scheme could support two papers.

**4.** Appellants merely contended (*see* Statement of Chief Judge Wald, at 6 n. 7) that the Attorney General's interpretation of the NPA would allow large corporate newspaper chains to obtain JOAs by pursuing a course of aggressive competition. Only the amicus mentioned predation, and its concern was that approval of the Detroit JOA would lead to illegal pricing *in Little Rock*. Amicus asserted that the Arkansas Gazette had engaged in "unprecedented" predatory action in hopes of obtaining a JOA (which suggests that Little Rock might be an appropriate place to advance the Chief Judge's argument). The amicus filed no public comments on the Detroit

cluding the antitrust division—before the ALJ or the Attorney General. Indeed, the ALJ specifically noted that it was unnecessary to consider whether predation would affect his analysis of the statute, because it was not argued in this case. ALJ Report, at 122 n. 303. And he observed that competition short of predation—even that designed to drive competitors out of business —was irrelevant, since the NPA "neither penalize[s] nor reward[s] firms determined to eliminate their competition." *Id.* at 122. No party specifically challenged either of those observations of the ALJ at any stage in these proceedings. It is, of course, black letter law that an argument not made before an agency cannot be the basis of a legal challenge on appeal. *Unemployment Compensation Comm'n v. Aragon,* 329 U.S. 143, 155, 67 S.Ct. 245, 251, 91 L.Ed. 136 (1946); *United States v. L.A. Tucker Trucklines,* 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952); *Safir v. Kreps,* 551 F.2d 447, 452 (D.C.Cir.1977) ("[A]ppellant is not free to raise points without regard to whether they were argued at some stage of the administrative process.").[5]

Chief Judge Wald's predation argument, moreover, implicates a good deal more than the Attorney General's approach to Joint Operating Agreements. If the Attorney General were to conclude that he would not approve a JOA if the stronger paper had engaged in below cost pricing for some period before the submission of the JOA, he would have to assume the responsibility for preventing that "predation." Otherwise, newspapers like the News would, for the reasons described above, engage in such behavior to achieve dominance in their markets without regard to a JOA. By suggesting that the News' pricing practices were "illegal predation," the Chief Judge, in other words, implicitly seeks to preempt prosecutorial decisions of the Executive Branch.

Nevertheless, the Attorney General and his Antitrust Division might ponder Chief Judge Wald's suggested approach to newspaper antitrust enforcement policy and modify their position accordingly. Or, in a future case, a party might make the argument the Chief Judge suggests. That, however, is all the more reason to deny rehearing here. If and when we are properly faced with the contentions the Chief Judge advances, we can decide their correctness. In that event, this case might not have any enduring impact.

WALD, Chief Judge, with whom MIKVA and HARRY T. EDWARDS, Circuit Judges, concur, dissenting from denial of rehearing en banc:

The split panel's approval of the Attorney General's decision to allow the Joint Operating Agreement ("JOA") between the Detroit Free Press and the Detroit News turns on the reasonableness of a single prediction: that even in the absence of a JOA or any possibility thereof, the News will continue to price below costs, sustaining significant losses itself and driving the Free Press from Detroit. *See* Majority Opinion, 868 F.2d 1285, 1290, 1291, 1294–95. Although the Newspaper Preservation Act's definition of a "failing newspaper" is ambiguous, Congress must have meant for the term to make *economic* sense; indeed it defined a failing newspaper as one "in probable danger of *financial failure.*" 15 U.S.C.A. § 1802(5) (*emphasis added*). Thus *Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) requires at a minimum that the Attorney General's prediction about future newspaper prices in Detroit be economically reasonable. I believe that the economic reasonableness of the Attorney General's prediction, on which the full weight of his decision to allow the JOA rests, is suffi-

---

JOA with the Attorney General and did not seek to intervene in that proceeding. The major Detroit-area newspaper unions and Mayor Young of Detroit did intervene before the Attorney General, *see* 28 C.F.R. § 48.11, but did not appeal. Moreover, appellants only barely (in one sentence) made the argument that Judge Ruth

B. Ginsburg focused on in her dissent—that exceptions to the antitrust laws should be narrowly construed.

5. Perhaps appellants did not raise the predation argument here because they knew it was not raised before the Attorney General.

ciently dubious to warrant *en banc* treatment.

His prediction about what would happen in the absence of a JOA makes no economic sense in light of the factual findings he himself accepted as true. Crucially, the Attorney General accepted the ALJ's basic finding that Detroit, the fifth-largest newspaper market in the country, can support *two profitable newspapers* if, in the words of Free Press management, "competitive pricing becomes rational and consistent with other markets around the country," ALJ Report at 85, *i.e.*, if these two competitors do not continue to engage in deliberately unprofitable pricing strategies with the predatory objective on the part of one paper to drive the other into failure so as to secure a JOA.[1] The Attorney General, of course, could have substituted different factual findings about the ability of the Detroit market to support two newspapers but he did not.[2] Thus, his conclusion that only *one* newspaper has a profitable future in Detroit, depends on the assumption that below-cost pricing is *probable* for the indef-

inite future, *without* the prospect of a JOA. But as to this critical finding the Attorney General (*see also* Majority Opinion at 1295) merely asserted that such pricing would not reflect "unsound business judgment" and that in response to such pricing "it would neither be counterintuitive nor contradictory" for the Free Press to shut down. Surely it cannot be enough, even under the second prong of *Chevron*, for the Attorney General just to say that, *and no more*, in view of both the ALJ's and the Antitrust Division's strong disagreement with that prediction.

Classic economic principles and basic antitrust law run counter to *any* prediction that sophisticated firms will pursue below-cost pricing strategies over the long haul. *See, e.g.*, McGee, *Predatory Pricing Revisited*, 23 J.L. & Econ. 289, 291–300 (1980); Bork, *The Antitrust Paradox*, 144–159 (1978); Areeda & Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act*, 88 Harv.L.Rev. 697, 697–704 (1975). (Newspaper giants like

---

1. The ALJ found that the Detroit situation was not one of a "junior" newspaper valiantly trying to retain a foothold in the market, *see* Majority Opinion at 1289, and that the characteristic elements pushing one paper into a "downward spiral," *see* Majority Opinion at 1291–1292 and 1295 n. 12, did not exist in Detroit. *See* In the Matter of Detroit Free Press, Recommended Decision 95–100 (Office of the Attorney General, No. 44–03–24–8, December 29, 1987) ("ALJ Report") (discussing relationship between scale economies, downward spiral and junior paper concerns); *id.* at 112–113 (finding relationship not to exist in Detroit). Judge Silberman in his concurrence in the denial of rehearing *en banc* suggests that it is sufficient that the newspapers expressed a belief in the junior newspaper problem even if there were no facts to show this was a rational belief; the full quote from the ALJ's report is: "The strategies pursued by the Free Press and News—future domination and profitability at the cost of current profits—were perceived by management as economically rational given the history of the demise of junior papers which had entered the downward spiral. *There is no convincing proof, however, that the economic conditions underlying this history—particularly the effects of scale economies—is applicable to these two large papers.*" ALJ Report at 112–13 (emphasis added).

The ALJ explicitly found that "[t]he objectives of dominance and future profitability were pursued by both papers (and their parents) in the belief that failure too had its reward in the form

of JOA approval" and that dominance was sought not by exploiting cost advantages but by cutting price below costs. Consequently, "as one might expect, Detroit cannot sustain two profitable papers when both are practically being given away." ALJ Report at 115.

2. Judge Silberman in his concurrence (and in the majority opinion) appears to contest this basic factual finding. But the ALJ explicitly rejected the argument that there was evidence that Detroit is a natural monopoly. And the Attorney General stated: The Free Press "plainly does not face *external* market forces—*such as* rising costs, competition from other media outlets and the siphoning off of readers from the metropolitan region to the suburbs—that would portend almost certain failure. Nor ... do there exist marketplace declines in overall advertising and newspaper circulation in Detroit of the sort that traditionally propel a junior newspaper into the proverbial "downward spiral" that is fatal to survival." Attorney General's Decision and Order, No. 44–03–24–8 (August 8, 1988) at 8 (emphasis added). Moreover, Free Press management itself stated that "one of the prerequisites to returning to profitability—for both newspapers—is restoring rational pricing in the market,"; in 1983 it "projected from an economic model that under conditions of 'normalized competition' the Free Press would earn $1.5 million per year and the News $5 million." ALJ Report at 85–86.

Knight–Ridder and Gannett certainly qualify as sophisticated). Yet this is precisely the predicate on which the Attorney General had to build his case: that the News will, *even if the JOA is denied*, price below its costs with the deliberate and unabashed goal of strangling the Free Press; and that the News will incur heavy losses far into the future (the ALJ found that it would take at least seven to ten years to eliminate the Free Press in this fashion) on the ephemeral hope of monopoly profits at the end of the line, assuming, that is, that its monopoly status goes *unchallenged* by a new or revived rival seeking to share in the spoils.[3]

The Supreme Court has only recently reiterated that "predatory pricing schemes are rarely tried, and even more rarely successful," *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 589, 106 S.Ct. 1348, 1357, 89 L.Ed.2d 538 (1986) (holding summary judgment appropriate where evidence insufficient to overcome theoretical economic obstacles to predatory conspiracy), and that they are "impossible to maintain" successfully in the absence of any "reason to suppose that entry into the relevant market is especially difficult," *id.* at 591 n. 15, 106 S.Ct. at 1359 n. 15; *see also Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 121 n. 17, 107 S.Ct. 484, 495 n. 17, 93 L.Ed.2d 427 (1986).[4] In view of this common wisdom, I believe

the Attorney General's economic prediction about the fate of the warring newspapers deserves a second look by an *en banc* court. Neither the Attorney General nor the panel provides any reasons why standard economic principles are not relevant to this case.

Nor do I see how a court can ignore the fact that the economic behavior on which the Attorney General's grant of immunity rests comes perilously close if it does not actually constitute [5] "a practice inimical to the purpose of the antitrust laws," *id.* at 118, 107 S.Ct. at 493.[6] The Newspaper Preservation Act authorizes the Attorney General to immunize from antitrust prosecution otherwise unlawful *mergers* between two newspapers. The Attorney General's decision here extends that immunity beyond merger to sustained below-cost pricing aimed at reducing a healthy two newspaper market to a monopoly press. In the view of the Attorney General himself the aim of at least one of the newspapers was to cut prices so as to eliminate a rival newspaper, enduring huge losses in the bargain, but thereafter attaining a monopoly. The notion that Congress intended the Newspaper Preservation Act to condone such a result is a sufficiently startling one to require perusal by an *en banc* court. Legislative history suggests that Congress wanted to preserve as many "reportorially

---

**3.** Economists agree that predatory pricing is undertaken only if the predator expects competitors to shut down and no new entry into the market to occur. *See, e.g.*, McGee, Bork, Areeda & Turner, *supra.* This analysis is of course crucially altered if a JOA is available, as the past behavior of these newspapers suggests. A JOA is precisely the type of guarantee that a potential monopolist needs to ensure that its rival will disappear for good. *See Matsushita, infra,* 475 U.S. at 591 n. 15 and n. 16, 106 S.Ct. at 1359 n. 15 and n. 16 (barriers to entry can secure future profits needed to recoup losses sustained in driving competitor from market permanently). It is not at all "inconsistent" to argue that it is possible that unprofitable price-cutting will occur when a JOA protects a future monopoly but that such behavior is unlikely if such protection will be denied.

**4.** Indeed, then Assistant Attorney General Douglas H. Ginsburg and Solicitor General Fried arguing for the government as *amicus curiae*

urged the Court in *Cargill* to find predatory pricing schemes *so* inherently unlikely that a *per se* rule was justified "denying competitors standing to challenge acquisitions on the basis of predatory pricing theories." 479 U.S. at 121, 107 S.Ct. at 495.

**5.** The ALJ observed that "predatory pricing" was "at least suggest[ed]" by the record. "To illustrate, it was a close question as to whether the Free Press or News would be designated the 'failing paper' for purposes of filing the JOA application. Finding 43. But the News's losses arose from such severe discounting that Gannett expressed concern over 'the potential problem of illegal advertising contracts entered into by the News and their advertisers during their war for ad volume.'" ALJ Report at 122–23 n. 303.

**6.** Whether the Attorney General would seek to prosecute such behavior independently under the antitrust laws is a separate question, which need not be answered in construing the statute.

independent and competitive" newspapers as possible, 15 U.S.C.A. § 1801 (congressional declaration of policy), but, recognizing that *some* markets in which two or more newspapers presently existed could support only one daily, sought to retain as much of the disappearing paper's voice as possible. Where, however, two independent papers can compete legally and stay alive, condoning resort by one to pricing which on the record is hard to distinguish from illegal predatory pricing, in order to secure a monopoly protected by a JOA, will, ironically, make it even *more* probable that newspapers will disappear than if the Act had never been passed in the first place. Whether that kind of immunity "effectuate[s] the policy and purpose" of the Act, 15 U.S.C.A. § 1803(b), *cf.* 15 U.S.C.A. § 1803(c) (immunity not to extend to predatory acts of jointly operating newspapers), is an important enough issue to merit a full court press.[7] For these reasons, I dissent from the decision to deny rehearing *en banc.*

---

7. Judge Silberman suggests that we cannot consider this consequence of the Attorney General's decision because "it was not raised by appellants." It was, however, raised by the appellants. Appellants stated in their brief that "as explained in more detail in the *amicus curiae* brief of Little Rock Newspapers, Inc., [the Attorney General's interpretation of the Act] would allow deep pocket newspaper owners to obtain a JOA almost at will … [A] corporation such as Gannett or Knight–Ridder that could afford short-term losses, could simply purchase a competing newspaper, and launch a price war by reducing circulation and advertising prices, which would force its competitor to do the same." Brief for Appellants at 44. As the *amicus* brief explained further in its primary argument (certainly not limited to Little Rock) that "The Newspaper Preservation Act Should Not Be Construed To Encourage Predatory Con-

duct:" "[t]he Attorney General's approval of the JOA … rewards potentially predatory conduct." "The [interpretation] convert[s] the Newspaper Preservation Act from a vehicle for preserving journalistic competition where it would otherwise not exist into a vehicle to assist in eliminating competitive newspapers even where both newspapers otherwise could survive.… The danger evident from the Attorney General's approval of the JOA here is that it endorses the anticompetitive tactics used." Brief for *Amicus Curiae* Little Rock Newspapers at 7; *id.* at 13. "Such a result was clearly not intended by Congress." Reply Brief of Appellants at 7 n. 3. It hardly implicates case or controversy or separation of powers to point out that cutting prices to sustain current losses with the objective of eliminating a rival and securing monopoly, "predatory conduct" as it was termed by Little Rock, is presumably illegal under the antitrust laws.