958 F.2d 1367
 35 Fed. R. Evid. Serv. 211
 Joan P. HANCOCK, Individually and as Guardian and
Conservator of the Estate of Danny L. Hancock, a
legally incapacitated person; Deborah
Gerber, Plaintiffs-Appellants,
v.
Barry DODSON; Art Schrah; City of Lake Orion, a Municipal
Corporation; Gordon Pizzini; J. Duke; D. Finney; D.
Feneley; Oakland County Sheriff's Department; Oakland
County, a Municipal Corporation; Lake Orion Police
Department, Defendants-Appellees,
Blue Cross & Blue Shield of Michigan, Claimant.
 No. 90-2372.
 United States Court of Appeals,
Sixth Circuit.
 Argued Nov. 13, 1991.
Decided March 23, 1992.
 
 Geoffrey N. Fieger (briefed), Dennis M. Fuller (argued), Fieger, Fieger & Schwartz, Southfield, Mich., for plaintiffs-appellants.
 Robert D. Brignall (argued and briefed), Vandeveer, Garzia, Tonkin, Kerr, Heaphy, Moore & Sills, Detroit, Mich., John J. Lynch, David B. Timmis, Birmingham, Mich., James I. DeGrazia, Maura D. Corrigan (argued and briefed), Plunkett, Cooney, Rutt, Watters, Stanczyk & Pedersen, Detroit, Mich., for defendants-appellees.
 Before: KENNEDY and JONES, Circuit Judges; and CONTIE, Senior Circuit Judge.
 CONTIE, Senior Circuit Judge.
 
 
 1
 Appellant John P. Hancock appeals the district court's entry of summary judgment in favor of appellees Art Schrah and City of Lake Orion, and the jury verdict in favor of appellees Oakland County, Oakland County Sheriff's Department and Officers Dodson, Duke, Pizzini, Finney and Feneley in this section 1983 civil rights action.
 
 I.
 
 2
 On July 19, 1986 appellant and her husband Danny L. Hancock ("Hancock") had an argument at their home. Hancock became upset and went out to the barn, taking one of his guns with him. Hancock had a history of depression and had threatened suicide in the past. Therefore, appellant was concerned by her husband's actions, and called his psychologist Dr. Kostere. Appellant told the doctor that she either heard a gun go off or thought she heard a gun shot. In response, Dr. Kostere called the Oakland County Sheriff's Department, because he thought that the situation posed a threat of severe danger.
 
 
 3
 A police radio dispatcher called Hancock's home to determine the scope of the problem. In response, Hancock stated that it was of no concern to the police department, and "if you send any cops over here, I'll kill them." Appellee's (Oakland) Brief at 7 n. 4. The radio communications thus alerted the officers that the incident involved a man with a gun, who was suicidal, possibly homicidal, and threatened to kill any officer who attempted to intervene.
 
 
 4
 Officer Gordon Pizzini was the first officer at the scene. Officer Dodson arrived shortly thereafter. Art Schrah of the Lake Orion police department was the next to arrive and was the only city police officer at the scene that evening. Officers Finney and Feneley joined the group, which met at Finney's car to discuss how best to handle the situation.
 
 
 5
 The officers decided that Dodson and Schrah would proceed behind the house while the other three officers remained in front of the house. While Dodson and Schrah walked to the back of the house, Dodson heard someone yelling inside in an "agitated, angry, hostile" tone. Looking through the back of the house, Dodson apparently could see a weapon positioned near the front door. Dodson opened the back screen door in order to determine if there were any victims in the house and to retrieve the weapon. Dodson worked his way through the house toward the front door. He heard Hancock screaming at the other three officers in the front of the house. Hancock then stepped out on to the front porch, at officer Pizzini's request.
 
 
 6
 As Dodson approached the front door from behind Hancock, he drew his gun, opened the door, stepped out on to the porch, and said: "We are the police, let's talk." At that instant, Hancock whirled around and struck Dodson on his inner thigh with his fist. At that point, a struggle to subdue Hancock ensued, but Officer Schrah was knocked away from the scene. He attempted to grab Hancock's arm, but was bumped out of the way before any physical contact occurred. Hancock was eventually handcuffed, driven to the police station and booked. Hancock was charged with assault and battery, disorderly conduct and resisting and obstructing arrest. The resisting and obstructing charges were later dropped, and Hancock plead guilty and paid a $60.00 fine for assault and battery and disorderly conduct.
 
 
 7
 At the time Hancock was brought into the police station, there was no evidence that he was severely injured. Hancock made no complaints about his treatment, and the nurse at the facility examined Hancock and found nothing wrong with him. Nevertheless, appellant alleged that Hancock was severely beaten by the arresting officers. Appellant contends that, immediately after his release from jail, he went to the Pontiac Osteopathic Hospital. Although no further medical treatment was recommended, and Hancock received no further treatment regarding this incident, the hospital's report clearly exhibited that Hancock had received some blows about the head and neck, as evidenced by the numerous bruises and other injuries noted by the physician in his Emergency Room Report. Joint Appendix at 524-27.
 
 
 8
 On January 5, 1987 Hancock was involved in a one-vehicle rollover accident when he lost control of his truck. Appellant claimed that Hancock did not appear to be seriously injured and he did not seek immediate medical care. Appellant stated that Hancock suffered no loss of consciousness or apparent physical injury from the accident. However, as a result of the accident, Hancock received a knot on the side of his head.
 
 
 9
 About seven weeks after the accident, Hancock began experiencing severe headaches, dizziness, loss of balance and pain. On February 25, 1987 he was taken to the emergency room where a subdural hematoma was diagnosed. The doctors performed emergency surgery on Hancock, which involved draining the hematoma.
 
 
 10
 The experts at trial testified that the fluid drained from the hematoma was a "crankcase oil" coloration. Appellant's experts testified that this was indicative of a longstanding injury, and that they believed that the hematoma originated with the police encounter. The appellees' experts testified that this fluid indicated an injury two weeks to two months old, which coincided with the vehicle accident.
 
 
 11
 Because of the pressure caused by the hematoma, Hancock developed permanent cognitive dysfunction which left him in a chronic vegetative state. On February 24, 1989, appellant brought suit alleging a violation of section 1983, assault and battery, excessive use of force and other state law claims. Appellant also filed a prior auto negligence action in another forum against a party not involved in this action seeking to recover for the same injuries.
 
 
 12
 Appellees Schrah and Lake Orion first moved for summary judgment on November 17, 1989. On January 19, 1990 appellants moved to amend their complaint to add a claim that Hancock's fourth and fourteenth amendment rights were also violated.
 
 
 13
 On February 26, 1990, the district court ordered that appellant's claims against the Lake Orion Police Department were dismissed with prejudice, that appellant's fifth and eighth amendment claims against the City of Lake Orion and Officer Schrah were dismissed with prejudice and that appellant's assault and battery claims against Schrah were dismissed with prejudice pursuant to the stipulation of the parties. The stipulation occurred because discovery had established that Schrah had never touched Hancock. In the same order, the district court denied without prejudice appellees' motion for summary judgment on the fourth and fourteenth amendments and section 1983 claims against Schrah and Lake Orion.
 
 
 14
 On February 27, 1990, the U.S. Magistrate granted appellant's motion to amend their complaint. Appellant again filed an amended complaint, ignoring the order of February 26, 1990. Accordingly, appellees renewed their motion for summary judgment on the fourth and fourteenth amendments and section 1983 claims. On July 26, 1990, the district court granted summary judgment as to all remaining fourth and fourteenth amendment claims against Schrah and Lake Orion. Appellant appealed this order, but later decided to address the order on appeal after trial.
 
 
 15
 The case proceeded to trial against the remaining appellees, including Oakland County and the county sheriff's department. After a lengthy trial, at which numerous disputed evidentiary issues were addressed, the jury returned a verdict for appellees.
 
 
 16
 Appellant then filed a notice of appeal, challenging the district court's grant of summary judgment for Schrah and the city of Lake Orion. Appellant also challenges numerous evidentiary issues which emerged at trial.
 
 II.
 
 17
 Appellant first contends that the district court erred in allowing into evidence Hancock's guilty plea to the misdemeanor of assault and battery because it was hearsay and does not come within the exception to Federal Rules of Evidence 803(22) which permits hearsay evidence of final judgments entered on a plea of guilty.
 
 
 18
 A district court's evidentiary determinations are subject to an abuse of discretion standard of review. See United States v. Rios, 842 F.2d 868, 872 (6th Cir.1988), cert. denied, 488 U.S. 1031, 109 S.Ct. 840, 102 L.Ed.2d 972 (1989). However, a district court's conclusions of law, such as whether proffered evidence constitutes hearsay within the meaning of the Federal Rules of Evidence, are reviewed de novo. United States v. Levy, 904 F.2d 1026, 1029 (6th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 974, 112 L.Ed.2d 1060 (1991).
 
 
 19
 A guilty plea to a misdemeanor charge made by a non-party is hearsay, and is not made an exception to the general rule barring admissibility of hearsay evidence by application of FRE 803(22). That exception allows the admission of evidence of a final judgment upon a guilty plea only if the crime is punishable by death or imprisonment of one year. However, where a guilty plea to a misdemeanor charge is made by a party, such an out of court statement is not hearsay by virtue of FRE 801(d)(2)(A) which excludes admissions by parties opponent from the definition of hearsay.
 
 
 20
 Appellant contends, however, that the policy behind the FRE 803(22) exception precludes admitting the guilty plea to a misdemeanor charge. Appellant reasons that FRE 803(22) does not embrace misdemeanor convictions because individuals have little motivation to defend the charges, and so the resulting guilty plea is unreliable. See Advisory Committee's Notes to FRE 803(22).
 
 
 21
 We need not address appellant's challenges to the reliability of guilty pleas to misdemeanor charges made by a party because such evidence is not hearsay, but is admissible non-hearsay under FRE 801(d)(2)(A). Where other courts have confronted this question, they have concluded that such guilty pleas, not made an exception under FRE 803(22), are admissible as non-hearsay under FRE 801(d)(2)(A). In United States v. Gotti, 641 F.Supp. 283 (E.D.N.Y.1986), the court held that
 
 
 22
 pleas and allocutions to misdemeanors by defendants may be made under circumstances indicating that they are quite as reliable as many admissions routinely admitted under Rule 801(d)(2)(A). In fact that subsection of the Rule does not even require that the declarant manifest his belief in the truth of the admission. Under Rule 403 the court can exclude a plea to a misdemeanor made under conditions that suggest its untrustworthiness. But unless those conditions appear, the court will admit such a plea and the accompanying allocution as an admission of a party.
 
 
 23
 Id. at 290. Accord Hinshaw v. Keith, 645 F.Supp. 180 (D.Me.1986). See, e.g., Romine v. Parman, 831 F.2d 944 (10th Cir.1987) (guilty plea in traffic offense is admissible in subsequent civil case); Rain v. Pavkov, 357 F.2d 506 (3d Cir.1966) (same).
 
 
 24
 We agree with the district court that Hancock's guilty plea to the assault and battery charges was admissible "in the nature of admissions." Joint Appendix at 748. Even though Hancock was not physically able to rebut the guilty plea at trial, we believe that he had ample opportunity to contest his plea prior to trial. Therefore, the guilty plea was sufficiently reliable to be admitted under FRE 403.
 
 
 25
 In the alternative, the district court held that the guilty plea was admissible under the catch-all exception FRE 803(24). We see no reason why such guilty pleas cannot be admitted provided they meet the requirements of FRE 803(24). "The omission from Rule 803(22) of a hearsay exception for a misdemeanor conviction does not imply a prohibition against admission of such a conviction under some other exception to the hearsay rule." Gotti, 641 F.Supp. at 289.[1] Therefore, we conclude that guilty pleas to misdemeanor charges may be admissible under FRE 803(24). In the present case we find the guilty plea to be trustworthy because Hancock was represented by counsel, and he had sufficient opportunity to challenge the guilty plea after it was entered. Under the circumstances, even though the plea was not admissible under FRE 803(22), it had "equivalent circumstantial guarantees of trustworthiness" to permit its admission under FRE 803(24).
 
 III.
 
 26
 Appellant next claims that the district court committed reversible error by allowing appellee to cross-examine appellant regarding an earlier no-fault lawsuit filed by appellant against another party. Appellant cites no authority to support this claim, arguing only that the evidence affected appellant's substantial rights. For the following reasons, we disagree.
 
 
 27
 The district court may admit evidence if it is relevant and if its probative value is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. FRE 403. A trial court's decision to admit or exclude evidence on the grounds of relevancy may not be reversed absent an abuse of discretion. Rios, 842 F.2d at 874. In the present case, the evidence of appellant's earlier civil suit against the insurance company was probative of the issue of causation and supported the jury's inference that Hancock's condition was caused by the accident and not the arrest. Evidence that appellant sought to recover for injuries incurred in the automobile accident tended to demonstrate that the accident was at least a contributing cause of Hancock's injuries. Since causation became the crux of appellant's case, this evidence was admissible unless the probative value is substantially outweighed by the danger of prejudice. Appellant, however, never explains how this evidence substantially prejudiced her rights. Indeed, the testimony at trial was limited to a single question about the prior lawsuit to which appellant replied, "we did feel the auto accident contributed to the problem and therefore they should be partially liable." We are unable to find that this evidence was unfairly prejudicial. "The hiring of an attorney and the filing of a lawsuit are generally done with considerable thought and care. Absent unauthorized conduct on the part of the attorney, there is nothing unfair about having to explain one's past lawsuits." Williams v. Union Carbide Corp., 790 F.2d 552, 556 (6th Cir.), cert. denied, 479 U.S. 992, 107 S.Ct. 591, 93 L.Ed.2d 592 (1986).
 
 
 28
 Therefore, we hold that the district court did not abuse its discretion in admitting this limited amount of evidence regarding the prior lawsuit.
 
 IV.
 
 29
 Appellant next argues that the district court erred in admitting the testimony of Hancock's treating physician because counsel for the defense had improper, ex-parte contacts with the doctor. For the following reasons, we find this testimony was admissible.
 
 
 30
 As an initial matter, this court must first decide which law of physician-patient privilege should govern this case. The parties both briefed the merits according to the Michigan law of privilege. However, in federal court when dealing with a federal question FRE 501 states that privilege "shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in light of reason and experience." In cases like the present, however, where state law claims are raised pendent to federal claims, the question of choice of law becomes more difficult.
 
 
 31
 In Perrignon v. Bergen Brunswig Corp., 77 F.R.D. 455 (N.D.Cal.1978) the court held that "in federal question cases where pendent state claims are raised the federal common law of privileges should govern all claims of privilege raised in the litigation." Id. at 459. This approach appeared to be most consistent with the congressional policy that "in nondiversity jurisdiction civil cases, federal privilege law will generally apply." Id. citing H.R.REP. NO. 1597, 93d Cong., 2d Sess. 7 (1974), reprinted in 1974 U.S.C.C.A.N. 7051, 7101. The court concluded that this policy should not be "cast aside simply because pendent state claims are raised in what is primarily a federal question case." Id.; accord Von Bulow v. Von Bulow, 811 F.2d 136, 141 (2d Cir.1987); William T. Thompson Co. v. General Nutrition Corp., 671 F.2d 100, 104 (3rd Cir.1982); Memorial Hospital for McHenry County v. Shadur, 664 F.2d 1058, 1061 n. 3 (7th Cir.1981); Sirmans v. City of South Miami, 86 F.R.D. 492, 495 (S.D.Fla.1980). Since the instant case is a federal question case by virtue of the appellant's section 1983 claim, we hold that the existence of pendent state law claims does not relieve us of our obligation to apply the federal law of privilege.
 
 
 32
 In G.M.C. v. Director of the Nat'l Institute for Occupational Safety & Health, 636 F.2d 163 (6th Cir.1980), cert. denied, 454 U.S. 877, 102 S.Ct. 357, 70 L.Ed.2d 187 (1981) the Sixth Circuit held that
 
 
 33
 [t]he common law did not recognize a physician-patient privilege at all. Whalen v. Roe, 429 U.S. 589, 602 n. 28 [97 S.Ct. 869, 877 n. 28, 51 L.Ed.2d 64] (1977). Neither has Congress codified the concept in a federal statute. A decision in this case based on considerations of the physician-patient relationship would, in effect, expand the scope of the "federal common law." This we decline to do.
 
 
 34
 Id. at 165; Fisher v. City of Cincinnati, 753 F.Supp. 692, 694 (S.D.Ohio 1990); see, e.g., In re Zuniga, 714 F.2d 632 (6th Cir.), cert. denied, 464 U.S. 983, 104 S.Ct. 426, 78 L.Ed.2d 361 (1983). Because the federal courts do not recognize a federal physician-patient privilege, appellant's arguments regarding the scope of that privilege must be rejected, and the district court's decision affirmed.
 
 
 35
 Even if we were required to apply Michigan law, however, appellant's challenge would still fail. In the present case, the appellant voluntarily produced medical records of the treating physician Dr. Doyle, but did not assert the privilege. It was subsequent to appellant's release of these medical records that the purported ex parte interviews occurred between defense counsel and the treating physician. The district court admitted the physician's testimony at trial, holding that "the privilege was waived when the material was released without a written assertion that the privilege was not waived." We agree with the district court.
 
 
 36
 Michigan Court Rule 2.314(B)(1) provides that a party who has a valid privilege may assert the privilege to prevent discovery of medical information if that privilege is asserted in response to a request to produce documents. "A privilege not timely asserted is waived in that action." Id. Although the Michigan courts are not in agreement in their interpretation of this rule, we believe that the decision in Schuler v. United States, 113 F.R.D. 518 (W.D.Mich.1986) is well reasoned and should be followed. In Schuler, the court held that a patient waived the privilege by voluntarily producing medical documents without asserting the privilege. Id. at 521. Therefore, any attempt to later assert the privilege must fail.[2]
 
 
 37
 In the present case, appellant's counsel executed a release to allow defense counsel to have access to the medical records. Since appellant did not assert the privilege at that time, MCR 2.314(B)(1) mandates that the privilege be deemed waived for purposes of this lawsuit.
 
 V.
 
 38
 Appellant next argues that the district court erred in granting summary judgment for Officer Schrah on appellant's section 1983 claims for unreasonable use of force and unlawful entry, and for the City of Lake Orion on appellant's claim that it inadequately trained its police force in violation of the fourteenth amendment.
 
 
 39
 Since the entirety of the issues challenged under this assignment of error were dismissed by the district court on summary judgment, we must review all of the following questions de novo. Klepper v. First American Bank, 916 F.2d 337, 341 (6th Cir.1990). Summary judgment is appropriate only where no genuine issue of material fact exists so that the movant is entitled to a judgment as a matter of law. If there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment may not be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). When making this determination, "inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Once the non-movant demonstrates that there is an absence of evidence to support the non-moving party's case, the movant must then set forth specific facts showing that there is an issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324-25, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); Anderson, 477 U.S. at 250, 106 S.Ct. at 2511.
 
 A.
 
 40
 Appellant first claims that the district court erred in granting summary judgment for appellee Schrah on the issue of whether he used excessive force in arresting Hancock in violation of the fourth and fourteenth amendments.
 
 
 41
 Claims of excessive force under section 1983 are properly analyzed under the fourth amendment's prohibition against unreasonable seizures of the person, and its corresponding reasonableness standard. Graham v. Connor, 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989). The fourth amendment reasonableness inquiry is an objective one: "the question is whether the officer's actions are 'objectively reasonable' in light of the facts and circumstances confronting them." Id. at 397, 109 S.Ct. at 1872.
 
 
 42
 In the present case appellant states that there were two pieces of evidence which created a genuine issue of material fact: (1) "Defendant SCHRAH's own testimony that he 'grabbed' MR. HANCOCK's right hand;" and (2) "Defendant DODSON's statement that 'it took five of us to subdue him.' " Appellant's Brief at 27. Appellant, however, mischaracterizes much of this testimony. Appellee Schrah never stated that he "grabbed" Hancock's right hand, but testified only that he "grabbed for" Mr. Hancock's right hand. Joint Appendix at 273-74. Therefore, this evidence does not create a question of fact as to whether Officer Schrah touched Mr. Hancock. In addition, Hancock's counsel earlier stipulated to dismiss the assault and battery claims against Schrah because discovery disclosed that Schrah never touched Hancock. Joint Appendix at 401-02. If Hancock's counsel stipulated that it would be impossible to succeed in an assault and battery claim against Schrah because Schrah never touched him, it can only be concluded that appellant could have no section 1983 claim against Schrah based on excessive force because Schrah could not have deprived him of his fourth amendment rights. McDowell v. Rogers, 863 F.2d 1302 (6th Cir.1988).
 
 
 43
 The only other evidence from which the trier of fact could infer that Schrah was involved in the confrontation was Dodson's deposition testimony that "it took five of us to subdue him." Joint Appendix at 185-86. Dodson's response was to the question: "Was it necessary to have five officers subdue him?" Dodson merely answered affirmatively without explicitly stating that Schrah participated. Although it can be inferred that Schrah participated, we find that in light of all the other evidence presented, this was not sufficient to create an issue of material fact. Therefore, summary judgment was appropriately granted for Schrah on the excessive force claim.
 
 
 44
 Appellant next alleges that Schrah violated Hancock's fourth and fourteenth amendment rights by entering appellant's home without a search warrant. The district court granted Schrah's motion for summary judgment on this issue, in which Schrah argued that there were exigent circumstances which allowed him to enter appellant's home without a warrant, and alternatively that he was protected by qualified immunity because he acted reasonably under the circumstances. We will address each issue in sequence.
 
 
 45
 Although a police officer normally is prohibited from entering a residence without a warrant, Payton v. New York, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980), an officer is justified in so acting if exigent circumstances exist. Jones v. Lewis, 874 F.2d 1125, 1130 (6th Cir.1989).
 
 
 46
 Federal courts have traditionally found exigent circumstances in the following three instances: (1) when the officers were in hot pursuit of a fleeing suspect; (2) when the suspect represented an immediate threat to the arresting officers and public; (3) when immediate police action was necessary to prevent the destruction of vital evidence or thwart the escape of known criminals. United States v. Morgan, 743 F.2d 1158, 1162-63 (6th Cir.1984), cert. denied, 471 U.S. 1061, 105 S.Ct. 2126, 85 L.Ed.2d 490 (1985).
 
 
 47
 In a civil action, the determination of whether exigent circumstances exist is properly resolved by the jury. Jones, 874 F.2d at 1130; Yancey v. Carroll County, 876 F.2d 1238, 1244 (6th Cir.1989); Reardon v. Wroan, 811 F.2d 1025 (7th Cir.1987). However, it is equally clear that in a case where the underlying facts are essentially undisputed, and where a finder of fact could reach but one conclusion as to the existence of exigent circumstances, the issue may be decided by the trial court as a matter of law. Jones, 874 F.2d at 1130, 1133; Reardon, 811 F.2d at 1029-30; Llaguno v. Mingey, 763 F.2d 1560, 1565 (7th Cir.1985) (en banc); Hindman v. City of Paris, 746 F.2d 1063, 1067-68 (5th Cir.1984).
 
 
 48
 In the case at bar, we find that the factual record amply demonstrates that exigent circumstances existed. First, the officers received a call over the police radio that there existed a situation involving a suicidal and possibly homicidal gunman. The dispatch reported that shots had been fired. At least one of the radio communications indicated that the subject had threatened to kill any police officer who arrived on the scene. Given these facts possessed by the officers upon their arrival at appellant's home, we believe that it was reasonable for the officers to perceive this situation as representing "an immediate threat to the arresting officers and public." Morgan, 743 F.2d at 1162-63. When Schrah circled around to the back of the house, he had no idea where the suspect was located. Once he arrived at the back entrance to the house, he looked through the rear door and saw a .22 caliber long gun against the wall next to the front door. He could see Hancock standing on the front porch, but could not see whether he was armed. Schrah decided to go through the house because it was the quickest route to get to the suspect to determine the extent of the threat which he posed. Under these circumstances, the officers were truly faced with an emergency situation, and were entitled to enter the house without a warrant. United States v. Dart, 747 F.2d 263, 267 (4th Cir.1984).
 
 
 49
 Moreover, appellant cannot be heard to complain about the warrantless police encounter which took place on appellant's front porch. Arguably, Hancock had a reasonable expectation of privacy in his front porch, as the area immediately surrounding his residence is protected by the fourth amendment. Oliver v. United States, 466 U.S. 170, 180, 104 S.Ct. 1735, 1742, 80 L.Ed.2d 214 (1984); See United States v. Thomas, 757 F.2d 1359, 1367 (2d Cir.) (reasonable expectation of privacy around front door of home), cert. denied, 474 U.S. 819, 106 S.Ct. 66, 88 L.Ed.2d 54 (1985). However, like the entry into the home itself, we hold that appellee Schrah was justified by exigent circumstances in entering the front porch area of appellant's home.
 
 B.
 
 50
 Lastly, appellant argues that the City of Lake Orion is liable under section 1983 for failing to train its police officers, with the result that appellant's constitutional rights were violated by one of those inadequately trained officers.
 
 
 51
 Because the only city police officer present committed no constitutional violation, the city cannot be liable for failure to train its police officers. City of Canton v. Harris, 489 U.S. 378, 391, 109 S.Ct. 1197, 1206, 103 L.Ed.2d 412 (1989).
 
 VI.
 
 52
 For the foregoing reasons, the district court's ruling is AFFIRMED.
 
 
 53
 NATHANIEL R. JONES, Circuit Judge, dissenting. Although I agree with parts IV and V of the majority opinion, I disagree with parts II and III and, therefore, would remand this case for a new trial. Accordingly, I respectfully dissent.
 
 
 54
 * Plaintiff-appellant contends that the trial court abused its discretion in holding that plaintiff's prior guilty plea to the charges of assault and battery and disorderly conduct was admissible evidence, because the plea was hearsay and its probative value was substantially outweighed by the danger of unfair prejudice and by its tendency to mislead the jury. I agree.
 
 
 55
 Federal Rule of Evidence 803(22) excludes the following from the hearsay rule: "Evidence of a final judgment, entered after a trial or upon a plea of guilty (but not upon a plea of nolo contendere), adjudging a person guilty of a crime punishable by death or imprisonment in excess of one year, to prove any fact essential to sustain the judgment...." As a threshold matter, this case indeed involves "[e]vidence of a final judgment ... entered upon a plea of guilty"--in other words, a piece of paper recording the fact that Mr. Hancock was convicted, upon a plea of guilty. The majority evidently reasons that this piece of paper is a statement of Mr. Hancock; thus, when offered against him, the statement is admissible as an admission.
 
 
 56
 Of course, the piece of paper is not a statement of Mr. Hancock; instead, it is a public record, which records the fact that Mr. Hancock pleaded guilty. In other words, the piece of paper is a statement of the court that it convicted Mr. Hancock after he pleaded guilty. That statement by the court, that public record, that piece of paper, is hearsay. An admission is contained within the hearsay, but that admission is admissible only if the hearsay is admissible.
 
 
 57
 Federal Rule of Evidence 803(22) provides the rule for this form of hearsay. It provides an exception for only hearsay statements evidencing a crime punishable by death or imprisonment in excess of one year. Because Mr. Hancock's conviction does not meet the criteria, the report of his conviction remains "[e]vidence of a final judgment, entered ... upon a plea of guilty" that is excluded as hearsay.
 
 
 58
 Lest there be any doubt, the advisory committee included the following explanation of the policy behind this rule: "[p]ractical considerations require exclusion of convictions of minor offenses, not because the administration of justice in its lower echelons must be inferior, but because motivation to defend at this level is often minimal or nonexistent." Fed.R.Evid. 803(22) advisory committee's note. This policy rationale, coupled with the fact that the record of conviction is hearsay containing an admission but not an admission itself, leads to only one logical conclusion: "[i]n order to effectuate the express policy of Rule 803(22) barring evidence of convictions punishable by imprisonment for less than one year, evidence of guilty pleas in non-felony cases should not be allowed as admissions under Rule 801(d)(2), or as statements against interest pursuant to Rule 804(b)(3)." 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Evidence p 803(22), at 354-55 (1975).
 
 
 59
 This case provides a classic example. Faced with felony charges, Mr. Hancock was motivated to, and did in fact, defend against the charges. But then the state offered a deal. It offered to drop the felony charges in return for a guilty plea to misdemeanor charges and the payment of a $60 fine. Now Mr. Hancock had to weigh $60 against legal fees. He had to weigh $60 against the possibility of conviction, no matter how remote. In short, the state's offer of such an outstanding plea bargain effectively removed any motivation that Mr. Hancock may have had to defend against the charges.
 
 
 60
 The majority rejects the straightforward application of Rule 803(22). First, it erroneously reasons that the record of conviction is itself an admission of Mr. Hancock, rather than merely hearsay containing an admission. This reasoning, however, leads to the anomalous result that misdemeanor convictions entered after a trial or a hearing would still be excluded, because they are not admissions. To admit misdemeanor convictions upon a guilty plea yet exclude misdemeanor convictions following a hearing is inconsistent with the first line of Rule 803(22), which treats "[e]vidence of a final judgment, entered after a trial or upon a plea of guilty" in equal terms. Furthermore, there is no reason to assume that one is any more probative of guilt than the other, as the majority expressly acknowledges in footnote 1.
 
 
 61
 The majority avoids this inconsistency by doing an end run around the Rules of Evidence. The majority holds, in the alternative, that even if the conviction is hearsay, it is admissible under the catch-all exception of Rule 803(24). That rule provides an exception for the following type of statement:
 
 
 62
 A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.
 
 
 63
 Fed.R.Evid. 803(24) (emphasis added).
 
 
 64
 The first problem with applying the catch-all exception here is that the exception only applies to types of hearsay that are not covered by the other exceptions. "Evidence of a final judgment, entered ... upon a plea of guilty" is, however, covered by Rule 803(22). A fair response to this contention would be that Rule 803(22) technically only applies to "[e]vidence of a final judgment, entered ... upon a plea of guilty ..., adjudging a person guilty of a crime punishable by death or imprisonment in excess of one year." The note of the advisory committee, however, resolves this ambiguity by noting that "[p]ractical considerations require exclusion of convictions of minor offenses." Thus, Rule 803(22) does express an intention to exclude misdemeanor convictions. It does not leave the issue ambiguous.
 
 
 65
 The majority omits the above discussion and, instead, focuses on the trustworthiness of the statement. Superficially, statements of courts and public records are certainly the most trustworthy of all hearsay statements. The issue here, however, is whether Mr. Hancock's admission, within the hearsay record, is probative of guilt. On this precise issue, the advisory committee has ruled that records of conviction are untrustworthy whenever used for this purpose, because potential misdemeanants often lack motivation to defend against the charges.[1] To ignore the advisory committee's statement is in direct conflict with part (C) of the catch-all exception, which explicitly requires that a court's utilization of the catch-all exception must be consistent with "the general purposes of these rules."
 
 II
 
 66
 Plaintiff-appellant contends also that the trial court committed reversible error when, after ruling that evidence of a prior action to recover no-fault benefits from Mr. Hancock's insurer was inadmissible, the trial court nevertheless allowed defense counsel to question plaintiff regarding the existence of the action. The record supports appellant's contention:
 
 
 67
 [THE COURT:] Then we have the plaintiffs' motion in limine to exclude evidence of no fault insurance coverage regarding the auto accident and evidence of other insurance coverage for certain medical expenses and bills. Now, that is one to which you have not had an opportunity to address yourself; is that correct?
 
 
 68
 MR. LYNCH: That is true, Judge Woods.
 
 
 69
 THE COURT: I can see no basis at this point for projecting into this lawsuit insurance.
 
 
 70
 MR. LYNCH: I will stipulate that the issue of insurance, I believe according to the law and collateral source at this point, is not a matter for the jury to hear.
 
 
 71
 There is, however, a pleading in that particular case, sworn pleading under oath where Ms. Hancock, through her attorney, states that, as a result of a rollover accident, "I was caused to be mentally incapacitated and, further, physically incapacitated for life as a result of the rollover accident." It's my position, at least that paragraph of the complaint, a sworn document under oath is an admission against interest in this case; whereas they are attempting to say that the incident with the Oakland County Sheriff's Department seven months earlier caused them to be mentally incapacitated and physical non-function. So, that's the purpose that I would introduce that paragraph out of the complaint that relates exactly to that issue.
 
 
 72
 MR. FIEGER: Your Honor, Mr. Lynch plays fast with the rules.
 
 
 73
 THE COURT: I thought we were talking no fault insurance regarding the auto accident, evidence of other insurance coverage for other bills and motions in that regard.
 
 
 74
 Now, I don't see how that is germane to what I was talking about.
 
 
 75
 MR. LYNCH: Judge, I agree. I will not get into those questions.
 
 
 76
 THE COURT: So much for that.
 
 
 77
 MR. FIEGER: He wants to put in the complaint filed against the auto insurance, which they denied coverage. There are no sworn statements anywhere. There is a complaint filed against the auto insurer. If he is going to put in portions, who has already admitted liability--
 
 
 78
 THE COURT: We are not going to do that. We are not trying that lawsuit.
 
 
 79
 J.A. at 740-42.
 
 
 80
 The district court's subsequent decision (apparently off the record) to admit the statement in the complaint as an admission was an abuse of discretion. First, the admission of the evidence violates the court's ruling on the motion in limine. At the very least, therefore, the court should have stated on the record its reason for subsequently admitting the evidence. Second, the allegation in the complaint that the auto accident "caused" Mr. Hancock's condition is in no way inconsistent with the theory that the accident aggravated a preexisting condition. Thus, the statement does not constitute an admission.
 
 
 81
 In fact, the evidence is not even relevant. The issue of whether the auto accident aggravated a preexisting condition, or instead, was the initial cause of the injury, is not relevant to the insurer's liability. If Mr. Hancock had medical payments coverage, he was covered for any injuries sustained. For example, consider an individual with a broken arm--the result of an attack--who later re-breaks the arm in an auto accident. If the individual's insurer denies coverage for the injury, the individual may sue the insurer. In a later suit against the attacker, however, evidence of the suit against the insurer is not probative of whether the attacker broke the arm in the first place. Similarly, Mrs. Hancock's attempt to obtain medical payments coverage is not probative of the ultimate cause of the injury. The fact that the auto accident occurred was not concealed from the jury, and the insurance coverage was not relevant.
 
 
 82
 The court's decision to admit the evidence was not harmless error. Introduction of the "admission" in the prior complaint deceived the jury by suggesting that Mrs. Hancock claimed elsewhere that the injuries were due to the roll-over accident rather than the alleged beating. The jury may have used this supposed evidence of fabrication to support its conclusion that the beating did not even take place. Thus, introduction of the evidence was inconsistent with substantial justice. Combined with the admission of the misdemeanor conviction, I would find that this is the type of error that necessitates a remand for new trial. See Fed.R.Evid. 103.
 
 
 
 [1]
 Even though Gotti involved a misdemeanor conviction and not a guilty plea to a misdemeanor, we are unable to find a distinction which would make misdemeanor convictions categorically more reliable than guilty pleas to misdemeanor charges
 
 
 [2]
 Appellant's reliance on Jordan v. Sinai Hospital, 171 Mich.App. 328, 429 N.W.2d 891 (1988) is not helpful. Jordan completely failed to consider the application of MCR 2.314(B)(1) to cases where the patient releases medical records without objection. Therefore, Schuler and not Jordan controls our analysis here
 
 
 [1]
 The same problem arises if any of the other hearsay exceptions are used to avoid the requirements of Rule 803(22). See, e.g., Fed.R.Evid. 803(8) (public record exception)