**William P. McDANNOLD,
et al., Plaintiff,**

**v.**

**STAR BANK, N.A., et al., Defendants.**

**No. C–1–94–002.**

United States District Court,
S.D. Ohio,
Western Division.

March 15, 1999.

Lee T Polk, Murphy Smith & Polk, Chicago, IL, Judith Boyers Gee, Covington, KY, for William P McDannold, plaintiff.

Judith Boyers Gee, Covington, KY, for Steven M Franzen, Paul A Ross, Nancy L Mertes, Anthony R Stidham, Lisa L Stahl, Robert M Von Bargen, Glen Lievestro, Luellen Flinders, Dave J Bleser, Robert W Patten, Steven W Miller, Rayford Randall, John T Knuehl, Paul D Hansel, Beckham W Fields, David J Corsmeier, Steven M Huitger, Robert T Hardwick, William R Byrd, Dennis P McCloskey, Charles D Campbell, Don Vernon Flint, Don Belcher, Tommy Luketich, Craig T Doyle, Charles C Antoloci, Donna J Bush, Timothy M Long, Steve Mefford, Robert O Pierce, Edward J Von Bargen, Louis John Zinnecker, Thomas L Gilpen, Richard L Ferrell, Carolyn Plotzick, James M Long, Glennis Lawson, Julie Sunderman, Darrin R Lawson, Steven E Horton, Gary R Hughes, Donald Fields, plaintiffs.

Carl John Schmidt, III, Eric Carl Holzapfel, Wood & Lamping, Cincinnati, OH, Amy E Gasser, Wood & Lamping, Cincinnati, OH, for Electro Jet Tool & Mfg Co Inc, intervenor-plaintiff.

Thomas Robert Schuck, Taft, Stettinius & Hollister, Cincinnati, OH, Robert Joseph Hollingsworth, Cors & Bassett, Cincinnati, OH, for Star Bank Na Cincinnati, defendant.

William J Hare, defendant pro se.

Robert Alexander Pitcairn, Jr, Katz, Teller, Brant & Hild Co, Cincinnati, OH, for Paul Weber, Laura J Gerding, Trustee of remainder interest in certain shares of common stock of Electro–Jet Tool & Mfg Co Inc purs to stock purchase agreement of 12/01/86, defendant.

John Byron Pinney, Graydon Head & Ritchey, Cincinnati, OH, Robert Alexander Pitcairn, Jr, Katz, Teller, Brant & Hild Co., Cincinnati, OH, for Laura J Gerding, Trustee, Endres, Trustee under a trust agreement with John Endres dated 09/24/85, defendant.

Michael Edward Maundrell, Schroeder Maundrell Barbiere & Powers, Cincinnati, OH, for John Endres, defendant.

Jeffrey R Dundon, Centerville, OH, for Frank J Gollings, Trustee of Electro–Jet Tool and Manufacturing Co Inc ESOP, intervenor-plaintiff.

Eric Carl Holzapfel, Wood & Lamping, Cincinnati, OH, for Electro Jet Tool & Mfg Co Inc, defendant.

Thomas Robert Schuck, Taft, Stettinius & Hollister, Cincinnati, OH, Robert Joseph Hollingswoth, Cors & Bassett, Cincinnati, OH, for Star Bank NA Cincinnati, counterclaimant.

## DECISION AND ENTRY OVERRULING MOTION FOR PARTIAL SUMMARY JUDGMENT OF DEFENDANT STAR BANK (DOC. # 228)

RICE, Chief Judge.

This litigation arises out of the leveraged buyout of the shares of stock of Electro–Jet Tool & Manufacturing Company, Inc. ("Electro–Jet"). In 1987, Defendant John Enders ("Enders"), who was then the beneficial owner of approximately 83% of the shares of that corporation's stock, decided to sell his interest in the company which he had founded and operated. In August, 1987, Thomas Simmons ("Simmons"), Enders' long-time attorney, had preliminary discussions with DevTek Corporation, a Canadian aerospace company, about a transaction involving the sale of Electro–Jet. In November, 1987, DevTek made a preliminary proposal to purchase the assets of Electro–Jet for the sum of $16 million.

At about that time, Paul Weber ("Weber"), President of Electro–Jet, and William Hare ("Hare"), its vice-president, discussed with Enders the possibility of the corporation being purchased by its employees through an employee stock ownership plan. When Enders expressed an interest in their proposal, Weber and Hare retained William Kirkham and his law firm, Lindhorst & Dreidame (collectively "L & D"), to represent the employee stock ownership plan which would be created to effectuate the purchase. Weber and Hare

also explored financing for that transaction and were able to secure a commitment from Star Bank ("Star") to loan approximately $10 million to complete the business transaction. On December 17, 1987, Weber and Hare met with Enders and Simmons in Albuquerque, New Mexico. At that meeting, the parties agreed that $15.2 million would be paid to Enders for his shares of Electro–Jet's stock. To consummate the transaction, it was decided to transform Electro–Jet's then existing profit sharing plan into an employee stock ownership plan ("ESOP").[1]

On December 23, 1987, employees of Electro–Jet were informed that the profit sharing plan would be transformed into the ESOP and that the ESOP would purchase, for the sum of $12.5 million, the 83% of the shares of Electro–Jet which were owned by Enders. Of that sum, $2.3 million would come from the assets of the ESOP and the remainder would be financed by a loan from Star. Electro–Jet, rather than the ESOP, would be responsible for repaying the loan. However, Star's loan would be secured by a pledge of the portion of Electro–Jet's securities which the ESOP would purchase with the money loaned by Star. The announcement regarding creation of the ESOP and the leveraged buyout also specified that the transaction was contingent upon obtaining an appraisal of the value of Electro–Jet, as required by law. On that day, Enders resigned from Electro–Jet's Board of Directors ("Board"), a Board of which he was the only member. On December 26, 1987, Laura Gerding ("Gerding"), a member of Electro–Jet's management and the Trustee of Enders' trust, elected herself, Weber and Hare to Electro–Jet's newly expanded Board. Star was slated to be the Trustee of the ESOP; however, it was not willing to serve in that capacity during the closing of the sale of Enders' shares of stock to the ESOP. Therefore, Gerding, Weber and Hare, in addition to serving on Electro–

Jet's Board, acted as the Trustees of the ESOP when the transaction in question closed. After a favorable appraisal was obtained from Gradison & Company ("Gradison"), the transaction closed on January 29, 1988. As a result, the ESOP became the owner of approximately 83% of Electro–Jet's shares, and it transferred $2.3 million of its assets to Enders.

The Plaintiffs, who are beneficiaries of the ESOP (with one of their number being its Trustee), brought this action on behalf of the ESOP. According to the Plaintiffs, Electro–Jet's securities were grossly overvalued and are now essentially worthless. As a result, the ESOP has lost the $2.3 million that it had contributed to the transaction. The Plaintiffs have asserted claims against a number of Defendants, including Star, L & D and Gradison. The Plaintiffs seek to recover from L & D and Gradison, under common law negligence theories, and have alleged that Star is liable under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, et seq., for breach of fiduciary duty. In addition to the defending that claim, Star has asserted claims against the Plaintiffs, alleging, inter alia, that it has a perfected security interest in any sum that the Plaintiffs are able to recover in this litigation. See Docs. # 152 and # 196. The Plaintiffs have settled their claims with L & D and Gradison for the total sum of $1.75 million, which has caused this litigation to come before the Court on Star's Motion for Partial Summary Judgment (Doc. # 228). With that motion, Star seeks summary judgment on its claim that it has a perfected security interest in the proceeds of the settlements between Plaintiffs, L & D and Gradison. As a means of analysis, the Court will initially set forth the standards which are applicable to all motions for summary judgment (partial or otherwise), following which it will turn to parties' ar-

---

1. For sake of convenience, the Court will use "ESOP" to describe that entity, regardless of whether the Court is referring to that entity before or after it was transformed from a profit sharing plan into an employee stock ownership plan.

gument in support of and in opposition to the instant such motion.

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Of course, the moving party:

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548. *See also Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991) (The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial.") (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir.1987)). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1245 (6th Cir.1995). Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law. Fed.R.Civ.P. 50). *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir.1989).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). *See also Michigan Protection and Advocacy Service, Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir.1994) ("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff."). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are ... 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir.1992) (citation omitted). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all *reasonable* inferences in the favor of that party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505 (emphasis added). If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-

finder. 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure*, § 2726. In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir.1989), *cert. denied*, 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990). *See also L.S. Heath & Son, Inc. v. AT & T Information Systems, Inc.*, 9 F.3d 561 (7th Cir.1993); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n. 7 (5th Cir.), *cert. denied*, 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment...."). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

Star argues that it is entitled to summary judgment on its claim that it has a perfected security interest in the $1.75 million, paid by L & D and Gradison to settle Plaintiffs' claims against them, because that sum represents proceeds from the collateral that was pledged to secure its loan to the ESOP (i.e., the shares of Electro–Jet's stock that the ESOP purchased with the funds loaned by Star). The Plaintiffs argue that those settlement funds are not proceeds from those securities. For reasons that follow, the Court concludes that Star has not met its burden of establishing the absence of a genuine issue of material fact concerning the question of whether the settlement funds are such proceeds.

The Court begins its analysis by setting forth certain fundamental principles which are applicable to Star's loan and with which the parties agree. The creation of the ESOP and the loan that Star made to it are governed by ERISA. The loan transaction, by which the ESOP purchased the shares of Electro–Jet's stock from Enders, was prohibited under that statute, by virtue of 29 U.S.C. § 1106, unless exempted from that prohibition by 29 U.S.C. § 1108(b)(3), and the regulations promulgated thereunder. Section 1108(b)(3) provides that the prohibition contained in § 1106 does not apply to:

> (3) A loan to an employee stock ownership plan (as defined in section 1107(d)(6) of this title), if—
>
> (A) such loan is primarily for the benefit of participants and beneficiaries of the plan, and
>
> (B) such loan is at an interest rate which is not in excess of a reasonable rate.
>
> If the plan gives collateral to a party in interest for such loan, such collateral may consist only of qualifying employer securities (as defined in section 1107(d)(5) of this title).

The regulations further limit the manner by which an entity, that has loaned money to an ESOP, may obtain payment of or security for that loan, from the ESOP:

> (e) *Liability and collateral of ESOP for loan.* An exempt loan must be without recourse against the ESOP. Furthermore, the only assets of the ESOP that may be given as collateral on an exempt loan are qualifying employer securities of two classes: Those acquired with the proceeds of the exempt loan and those that were used as collateral on a prior exempt loan repaid with the proceeds of the current exempt loan. No person entitled to payment under the exempt loan shall have any right to assets of the ESOP other than:
>
> (1) Collateral given for the loan,
>
> (2) Contributions (other than contributions of employer securities) that are

made under an ESOP to meet its obligations under the loan, and

(3) Earnings attributable to such collateral and the investment of such contributions.

29 C.F.R. § 2550.408b–3(e). Thus, under ERISA, the only permissible collateral Star could have received was the shares of stock which the ESOP purchased with the loan. Moreover, Star can have a security interest on the settlement funds, only if those funds represent earnings attributable to those shares of stock.[2] An examination of the Plaintiffs' claims reveals that the settlement funds are not earnings attributable to those securities.[3]

Before the transaction creating the ESOP occurred, the ESOP had assets of $2.3 million, all of which were used to purchase securities from Enders. The Plaintiffs have claimed that L & D, which had been retained to represent the ESOP, committed malpractice which permitted the transaction to close, thus causing the ESOP to lose the $2.3 million (plus the opportunity to grow those assets over the ensuing years). In addition, under federal law, the transaction could not close, unless a favorable appraisal was obtained. See 26 U.S.C. § 401(a)(28)(C). Gradison was retained to perform that appraisal and, according to the Plaintiffs, did so negligently. As with L & D, the Plaintiffs have assert-ed that Gradison's negligence permitted the transaction to close, and that, as a result, the ESOP lost the $2.3 million (plus the opportunity to grow those assets over the ensuing years). In sum, an employee stock ownership plan, with assets worth $2.3 million, lost its assets, allegedly as a result of the negligence of a law firm and a professional appraiser. To recover the amount so lost, the beneficiaries of the ESOP have sued the allegedly negligent professionals and have obtained a settlement. Simply stated, L & D and Gradison have paid $1.75 million to compensate the ESOP for the loss of $2.3 million, which was allegedly caused by their negligence; therefore, the sum of $1.75 million does not constitute earnings attributable to the shares of stock that were purchased by the ESOP with the loan made by Star.

■ Moreover, the statute relied upon by Star, Ohio Revised Code § 1309.25(A) (Ohio's version of § 9–306(1) of the Uniform Commercial Code), contradicts rather than supports its position. Section 1309.25(A), which defines proceeds, provides, in pertinent part:

"Proceeds" includes whatever is received upon the sale, exchange, collection, or other disposition of collateral or proceeds. Insurance payable by reason of loss or damage to the collateral is

**2.** The settlement amounts are unquestionably neither shares of Electro–Jet's stock (the collateral) nor contributions to the ESOP.

**3.** In its motion, Star relies primarily upon language contained in the stock pledge agreement, which was executed when the ESOP transaction closed, and Ohio Revised Code § 1309.25(A), Ohio's version of § 9–306(1) of the Uniform Commercial Code, although it states that both are consistent with the limitations contained in 29 C.F.R. § 2550.408b–3(e). The Plaintiffs argue that the stock pledge agreement and § 1309.25(A) are preempted by ERISA. Although generally acknowledging the preemptive force of ERISA, Star focuses primarily upon § 1309.25(A), while arguing that said statutory provision is not preempted, because it is a law of general applicability. To the extent that either the stock pledge agreement or § 1309.25(A) would give Star a greater right to the settle-ment funds than § 2550.408b–3(e), the Court agrees with Plaintiff that such is preempted by ERISA. Under 29 U.S.C. § 1144(a), state laws that "relate to any employee benefit plan" (of which the ESOP is one) are preempted. Herein, the question is not whether a state law of a general nature that tangentially affects an employee benefit plan is preempted. Rather, regulations adopted under ERISA *expressly* provide for the manner by which an entity, that has loaned money to an ESOP, may obtain payment of or security for that loan, from the ESOP. Any state law that would afford a lender greater protection is preempted. Parenthetically, for reasons set forth below, the Court concludes that Star would not be entitled to a security interest in the settlement funds, even if the Court were to decide the issue by applying the language in the stock pledge agreement or § 1309.25(A).

proceeds, except to the extent that it is payable to a person other than a party to the security agreement. Any payments or distributions made with respect to investment property collateral are proceeds.

That definition demonstrates that the settlement funds are not proceeds, since the Plaintiffs are not receiving those funds as a result of having sold, exchanged or otherwise disposed of the shares of Electro–Jet's stock (i.e., the collateral). Rather, they are receiving those funds as a result of exchanging other assets belonging to the ESOP, to wit: negligence claims against L & D and Gradison, for the total sum of $1.75 million. Since the money paid by L & D and Gradison is not "proceeds," *McGonigle v. Combs,* 968 F.2d 810 (9th Cir.), *cert. dismissed,* 506 U.S. 948, 113 S.Ct. 399, 121 L.Ed.2d 325 (1992), the case upon which Star places primary reliance, can be distinguished. Therein, the plaintiffs sued a number of entities that had been involved in the sale of some shares of stock of a company, by a private placement. One of the plaintiffs, Casares, asserted claims against the bank that had loaned him the entire amount he had used to purchase the stock. The bank counterclaimed against Casares, seeking to collect the principal and interest of the loan, none of which had Casares paid. The District Court granted summary judgment to the bank on both Casares' claim and its counterclaim. After another defendant (an owner of the company whose stock had been sold) settled, the bank and Casares' attorney became embroiled in a dispute over which was entitled to Casares' portion of the settlement funds. The bank claimed that it had a security interest in those funds, because they represented proceeds from the stock Casares had purchased with its loan (the bank had a security interest in that stock). The Ninth Circuit, applying Kentucky's version of UCC § 9–306(1), agreed, concluding that those funds were being substituted for the worthless shares of stock that Casares had purchased with the bank's money. In addition, the Ninth Circuit concluded that the claim which had been settled was analogous to claims in cases in which courts have held that money paid by an insurance company to compensate for damage to collateral constitutes proceeds, because the value of the stock had been diminished by the actions of the defendant who had settled. Thus, the Ninth Circuit concluded that the "locus of the loss" suffered by Casares was the stock. On the contrary, the settlements, into which the Plaintiffs herein have entered, are not being substituted for the Electro–Jet stock that the ESOP purchased with that money that Star had loaned; rather, those settlements will merely compensate the ESOP and its beneficiaries for a portion of the $2.3 million that was lost in the transaction. The actions of L & D and Gradison did not cause Electro–Jet's stock to be less valuable; rather, those actions allegedly permitted the ESOP to enter into the transaction in the first instance. Therefore, in the words of the Ninth Circuit, "the locus of the loss" suffered by the ESOP was the fact that, before the transaction, it had assets worth $2.3 million, which it lost as a result of the alleged negligence of L & D and Gradison. In other words, the actions of L & D and Gradison did not diminish the value of the shares of stock that the ESOP purchased with the funds that Star had loaned. Rather, that stock was effectively worthless when it was purchased and remains so today.

Similarly, the stock pledge is of no help to Star. Under that agreement, Star obtained a security interest in the stock that was being purchased with the money it had loaned ("pledged stock"). Section 1(b)(*l* ) defines pledged stock to include, *inter alia,* all cash received "in exchange for any such shares." The settlement funds are being paid in exchange for the ESOP's negligence claims, rather than in exchange for shares of Electro–Jet's stock.

Accordingly, the Court overrules Star's Motion for Partial Summary Judgment (Doc. # 228).[4]

4. In so ruling, the Court is not addressing the issue of whether some other sum, which the Plaintiffs might be able to recover in this litigation, would constitute earnings attributable to the stock that the ESOP purchased with the money that Star had loaned. That question need only be addressed, if the Plaintiffs ultimately recover some other sum.