*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0413P (6th Cir.)
File Name: 03a0413p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

PATRICIA BOWMAN,
     *Plaintiff-Appellee/*
*Cross-Appellant,*

     *v.*

CORRECTIONS CORPORATION
OF AMERICA,
     *Defendant-Appellant/*
*Cross-Appellee.*

Nos. 00-6719/6720

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 96-01142—William J. Haynes, Jr., District Judge.

Argued: March 27, 2003

Decided and Filed: November 21, 2003

Before: BOGGS, Chief Judge; and SUHRHEINRICH and
SILER, Circuit Judges.

_____

2     *Bowman v. Corrections*     Nos. 00-6719/6720
      *Corp. of Am.*

_____

## COUNSEL

**ARGUED:** James F. Blumstein, VANDERBILT
UNIVERSITY LAW SCHOOL, Nashville, Tennessee, for
Appellant. John W. Chandler, Jr., Memphis, Tennessee,
Patrick A. Ruth, RUTH, HOWARD, TATE & SOWELL,
Nashville, Tennessee, for Appellee. **ON BRIEF:** James F.
Blumstein, VANDERBILT UNIVERSITY LAW SCHOOL,
Nashville, Tennessee, Andree Sophia Blumstein,
SHERRARD & ROE, Nashville, Tennessee, Tom Anderson,
ANDERSON LAW FIRM, Jackson, Tennessee, for
Appellant. John W. Chandler, Jr., Memphis, Tennessee,
Patrick A. Ruth, RUTH, HOWARD, TATE & SOWELL,
Nashville, Tennessee, Joseph Howell Johnston, Nashville,
Tennessee, for Appellee.

_____

## OPINION

_____

BOGGS, Chief Judge. Anthony Bowman was an inmate at
the South Central Correctional Center (SCCC) who had a
long history of medical problems associated with sickle cell
anemia. Over the course of his incarceration at SCCC,
Anthony experienced numerous infections, and was
hospitalized repeatedly. During one such episode, on
January 3, 1996, Dr. Coble, the medical director at SCCC,
admitted Anthony to the SCCC infirmary, having diagnosed
him with "an early pneumonia," and on January 4, 1996,
Anthony was transferred to the Nashville Memorial Hospital
where he died a day later, at the age of twenty-eight.

Anthony's mother, Patricia Bowman, on behalf of her son
and his two children (collectively Bowman) filed a civil rights
complaint under 42 U.S.C. § 1983, naming as defendants,

among others, the Corrections Corporation of America (CCA), Kevin Myers, the warden of CCA's South Central Facility, and Dr. Robert B. Coble, the physician with whom CCA contracted for medical services for inmates housed within SCCC. The complaint alleged that the defendants had violated her son's constitutional right to adequate medical care while incarcerated. The case went to trial and the jury found that the defendants had not acted with deliberate indifference towards Anthony's serious medical condition. The district court entered judgment in accordance with the jury verdict, but granted Bowman's motion for judgment as a matter of law in part, holding that CCA's medical policy, as reflected in its agreement with Dr. Robert B. Coble, is unconstitutional. On this basis, the district court enjoined CCA and all parties acting in concert with it from enforcing its contract with Dr. Coble and additionally granted the plaintiff's motion for sanctions, but only to the extent of awarding attorney's fees in relation to a particular evidentiary dispute in which CCA failed to supplement properly its discovery responses as to the number of referrals it had made to medical specialists on behalf of inmates. Bowman also moved for an award of attorney's fees under 42 U.S.C. § 1988 as a "prevailing party" in a § 1983 case. The district court awarded Bowman attorney's fees and costs, but only on a pro-rated basis for the issues upon which she had "prevailed" against the defendants.

CCA appeals both the district court's injunction and its award of attorney's fees under 42 U.S.C. § 1988 to Bowman. Bowman cross-appeals the district court's partial denial of her motion for a judgment as a matter of law or for a new trial, on her claims for compensatory and punitive damages against CCA, Dr. Coble, and Myers for their alleged violations of Bowman's son's Eighth Amendment right to be free of "cruel and unusual punishment." We affirm the district court's denial of Bowman's motion for judgment as a matter of law or a new trial because there was evidence to support the jury's verdict and the district court did not abuse its discretion in

making the various evidentiary rulings objected to by Bowman. We reverse the district court's holding with respect to the unconstitutionality of CCA's medical policy and the injunction awarded on that basis, because this issue is moot as to Bowman and she had no standing upon which to bring such a claim for prospective relief. Finally, we vacate the district court's award of attorney's fees to Bowman, because Bowman is no longer the prevailing party.

## I

### A. The Medical Contract

During 1990, the State of Tennessee issued a request for proposals from private companies to manage the South Central Correctional Center (SCCC)[1]. The proposals were to include a detailed budget of projected costs for operating the SCCC, including the cost of providing medical care to SCCC inmates. Tennessee required the companies submitting proposals to state how much they would charge Tennessee on a per inmate per day (PIPD) basis to manage the SCCC and their estimated profit for doing so. On January 24, 1992, following negotiations regarding the SCCC budget and CCA's profit margin, CCA entered into a three-year contract with the State of Tennessee, acting through the Tennessee Department of Corrections (TDOC), to house state prisoners at CCA facilities, including SCCC. The contract contained an option to renew for two additional years.

As part of the contract process, CCA estimated its medical expenses for the treatment of prisoners. This expense category included hospital expenses incurred during the first seventy-two hours up to four thousand dollars per hospitalization, referrals to medical specialists, prescription drugs and laboratory tests. CCA's initial projection was

---

[1]Also referred to as SCCF: South Central Correctional Facility.

$500,000 per year for these expenses (projecting an average of $1.34 PIPD in 1992, gradually rising over the years to an average of $1.48 in 1997). However, during 1992, 1993, and 1994, CCA's actual expenses for these services and products averaged $1,000,000 per year ($3.75 PIPD in 1992, $3.16 PIPD in 1993, and $2.41 PIPD in 1994). In response to being so dramatically over budget, CCA negotiated a contract with Dr. Coble to be the exclusive provider of medical services at SCCC. Dr. Coble was, among other things, to "determine the existence of medical emergencies," and therefore determine when it was necessary to send a patient to the hospital or for a medical referral. This contract was executed on October 6, 1994, and effectively created a managed health-care system at SCCC. The contract automatically renewed itself on an annual basis and could be terminated by either party upon 60 days notice.

Unlike CCA's previous agreements with other physicians, this contract provided a "capitation plan," which provided Dr. Coble with a financial incentive to reduce the PIPD costs for CCA. Dr. Coble received a minimum salary under the contract, but was able to earn up to an additional $100,000 annually by reducing CCA's costs.[2] The way in which the incentive system worked is laid out in the contract and can be understood as follows:

According to CCA's contract with Dr. Coble, he was to be paid a flat rate of $9.40 per inmate under his care, every month. However, twenty percent of that figure was "withheld" so that Dr. Coble's minimum salary was actually eighty percent of $9.40 or $7.52 per inmate, per month.

---

[2] For some reason the district court and Bowman's briefs both use the figure of $95,000, but the defendants admit in their response to Bowman's second request for admissions that Dr. Coble could earn as much as $100,000. Of course this number would fluctuate according to the number of inmates at SCCC, since Dr. Coble was paid on a per inmate basis.

Every six months, CCA would calculate the amount being spent PIPD. If the amount being spent was equal to or more than $3.07, which was the average amount being spent by CCA PIPD at the time of contract negotiations with Dr. Coble, no further money would be distributed to Dr. Coble. If, however, the amount being spent PIPD was less than $3.07, Dr. Coble would receive a "proportionate return" of the amount withheld, up to the full $9.40 per inmate. Finally, Dr. Coble would receive an additional five percent bonus if he was able to keep the PIPD cost below $2.47.

From the very beginning, it is undisputed that Dr. Coble received the maximum amount of income that he could under his contract with CCA, since he was able to reduce CCA's non-personnel medical expenses at SCCC below the lowest level set forth in the capitation plan provision of his contract. Furthermore, it is agreed that during Dr. Coble's tenure, the total amount CCA spent on inmate medical services at SCCC remained approximately the same per year at $1,000,000 from 1994 through 1997, despite the fact that the population of inmates increased from 1311 in October 1994, to approximately 1506 in 1997,[3] and the fact that, after August 1995, TDOC began to charge CCA for prisoners sent to the DeBerry Special Needs Facility for specialty consultations, when it had not previously done so. By June 1995, CCA's PIPD cost was reduced to as little as $1.46, and appears to have remained close to that amount thereafter.

---

[3] A chart supplied by TDOC reports that the number of inmates at SCCC during the month of October 1994 was 1311, but does not reflect numbers for 1997. A letter from the warden of SCCC, which discusses the remarkable reduction in costs for prescription drugs since 1994, despite the increase in the number of inmates, reflects an inmate population size of 1506 during the months of February through August, 1997. Although there is some dispute over precise numbers for this time period, both parties agree that the inmate population increased significantly from 1994 to 1997, and the numbers supplied by these exhibits are evidence of that increase.

The evidence suggests that this remarkable reduction in costs resulted primarily from less specialty referrals and less money spent on prescription drugs. For example, the physician at SCCC before Dr. Coble referred SCCC inmates to medical specialists 1,886 times the year prior to October 1994, while Dr. Coble referred SCCC inmates to medical specialists only 506 times the following year. Similarly, the cost of prescription drugs provided to SCCC inmates was reduced by approximately thirty-nine percent from 1994 to 1997.[4]

### B. Bowman's Case

Anthony Bowman was an inmate at SCCC, who had been incarcerated for violating the conditions of his parole, following a conviction for passing forged checks. Throughout his life he had suffered from a form of sickle cell anemia known as "acute chest syndrome," a genetic blood disorder in which sickled red blood cells clog the capillaries of the lungs and prevent the normal exchange of carbon dioxide for oxygen. In the last years of his life, he experienced frequent crises and his medical records reveal that he was seen almost daily by medical personnel at SCCC.

On January 1, 1996, Anthony arrived at the medical department at SCCC in a wheelchair, complaining of severe pain on the left side of his chest, from his armpit to his ribs. His blood pressure, pulse, and respirations were elevated and he had a fever of 102.4 degrees. After consulting with Dr.

---

[4]In a letter from Warden Myers of SCCC describing the remarkable savings achieved during the period from 1994 to 1997, the warden lists the amount of money spent on prescription drugs from February through August of each year, along with the inmate population. In 1994, the population was 1336 and the amount spent on prescription drugs was $108,751, which is approximately $81.40 per inmate. In 1997, the population was 1506 and the amount spent on prescription drugs was $74,660, which is approximately $49.58 per inmate.

Coble by telephone, the nurse, John Crunk, gave him an intramuscular injection of the synthetic opiate Nubane, gave him an oral antibiotic and Tylenol for his temperature, and placed him in the infirmary. Anthony was examined by Dr. Coble the next day and received an x-ray. Two days later, on the morning of January 4, 1996, Dr. Coble called Dr. Capobianco to arrange approval for a transfer of Anthony to Nashville Memorial Hospital to the care of Dr. Boatright, who had treated him in the past. Anthony was transferred that afternoon and admitted to Nashville Memorial Hospital. Anthony died in the hospital the afternoon of January 5. According to the autopsy report, he died of complications related to his sickle cell anemia, including acute bronchopneumonia, autosplenectomy, and hepatomegaly.

This case began as a civil rights action, based on the line of cases holding that deliberate indifference to a prisoner's illness or injury by prison authorities violates the Eighth Amendment, as made applicable to the states by the Fourteenth Amendment's Due Process Clause, and is, therefore, a valid cause of action under § 1983. *See, e.g., Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). Suing on behalf of her son and his two children, Patricia Bowman sought compensatory and punitive damages jointly and severally from CCA, Myers, and Dr. Coble for violating Anthony's Eighth Amendment right. She claims that Dr. Coble's delay in sending Anthony to the hospital caused his death and was an example of his deliberate indifference towards Anthony's medical care as a result of his financial arrangement with CCA. Bowman contends that CCA's policy authorized and encouraged deliberate indifference, since CCA did not investigate the dramatic drop in medical costs to the inmate population and simply urged Dr. Coble to reduce those costs further. Finally, Bowman contends that Warden Myers exhibited deliberate indifference to Bowman's care, because he allegedly failed to investigate the medical care that Bowman was receiving after having received a concerned telephone call from TDOC Commissioner

Campbell, which should have put him on notice that there was a problem.

The case was tried to a jury, which returned a verdict in favor of the defendants CCA, Myers, and Dr. Coble. The jury specifically found that neither Dr. Coble nor Warden Myers was deliberately indifferent to Anthony's serious medical condition and thus, there was no violation of Anthony's constitutional rights. The district court entered judgment for the defendants in accordance with the jury verdict, but held that CCA's medical policy violated the Eighth Amendment right of inmates at SCCC to receive adequate medical care and enjoined enforcement of Dr. Coble's contract. This appeal followed.

## II

### A. Motion for a Judgment as a Matter of Law

The district court denied Bowman's motion for judgment as a matter of law, or in the alternative, for a new trial pursuant to Fed. R. Civ. P. 50(b). Bowman contends that the district court erred in not granting her motion for judgment as a matter of law against Dr. Coble, Warden Myers, and CCA, because the jury verdict was contrary to the evidence presented at trial. We review the denial of a motion for judgment as a matter of law *de novo*. *McCurdy v. Montgomery County*, 240 F.3d 512, 516-17 (6th Cir. 2001) (citing *Cook v. Am. S.S. Co.*, 53 F.3d 733, 740 (6th Cir. 1995)). Fed. R. Civ. P. 50(a)(1) states that "[i]f during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue," then judgment as a matter of law for the opposing litigant is appropriate. The motion "may not be granted unless reasonable minds could not differ as to the conclusions to be drawn from the evidence." *McJunkin Corp. v. Mechanicals, Inc.*, 888 F.2d 481, 486 (6th Cir. 1989). An appeals court is not to "weigh the evidence, pass on the

credibility of witnesses, or substitute its judgment for that of the jury." *Toth v. Yoder Co.*, 749 F.2d 1190, 1194 (6th Cir. 1984). Instead we must view the evidence in the light most favorable to the opposing party, drawing all reasonable inferences in its favor. *Ibid.*

In order for Bowman to have succeeded in her claim that the defendants violated Anthony's Eighth Amendment right, she must have demonstrated "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106. Mere negligence or malpractice is insufficient to establish an Eight Amendment violation. *Id.* at 106 n.14. The Supreme Court has further explained that the *Estelle* standard contains both an objective component – whether the deprivation was sufficiently serious – and a subjective component – whether the prison official acted with a sufficiently culpable state of mind. *Farmer v. Brennan*, 511 U.S. 825, 838-39 (1994).

Bowman argues that Dr. Coble was liable on the theory that he responded to the financial incentives in his contract with CCA by denying appropriate care to SCCC inmates, including Bowman. However, the defendant's proof included the testimony of two physicians who were familiar with the treatment of sickle cell anemia, Dr. John Flexner and Dr. Frank Thomas. Both of these physicians testified that Dr. Coble's treatment of Anthony was appropriate. With this testimony, the jury could reasonably conclude that Coble was not deliberately indifferent and, as we have stated above, we will not second guess the jury's determinations of credibility. *See Toth*, 749 F.2d at 1194.

Warden Myers was liable, according to Bowman, on the theory that he allegedly failed to investigate the medical care Bowman was receiving after he received a telephone call from TDOC Commissioner Campbell on January 2, 1996, which put him on notice about concerns regarding Bowman's medical care. Warden Myers was responsible for the day-to-

day operations of SCCC and only had supervisory authority over Dr. Coble in relation to administrative matters, such as the transportation and security of the inmates. According to Myers's deposition testimony, Dr. Coble's medical decisions were not reviewable by Myers. Furthermore, Myers testified that he knew Dr. Coble to be familiar with Anthony and his history of sickle cell anemia, and relied on the doctor to provide Bowman with appropriate medical care. Based on this evidence, the jury could reasonably conclude that even after having received a concerned phone call, Myers's reliance on Dr. Coble did not rise to the level of deliberate indifference. In sum, although there was evidence presented to contradict the conclusion reached by the jury, there was nevertheless sufficient evidence to support the jury's findings and they are not clearly erroneous. For these reasons we agree with the district court that there was sufficient evidence to uphold a judgment in favor of Dr. Coble and Warden Myers.

Next, Bowman argues that even if Dr. Coble and Warden Myers were not deliberately indifferent, and therefore not liable, CCA's policy, as embodied in its contract with Dr. Coble, and its subsequent lack of investigation as the costs for medical care for inmates at SCCC plummeted, was nevertheless unconstitutional and, thus, CCA should be held liable. However, on the basis of *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986), and our subsequent decision in *Hancock v. Dodson*, 958 F.2d 1367, 1376 (6th Cir. 1992), the district court held that without a constitutional violation of Anthony's Eighth Amendment right by Dr. Coble or Warden Myers, CCA cannot be held liable for its policy, even if it were to encourage deliberate indifference. We agree.

In *Heller*, the plaintiff brought a § 1983 case against the City of Los Angeles, members of the city police commission, and two police officers who had stopped and arrested him on suspicion of driving while intoxicated. Mr. Heller claimed

damages for having been arrested without probable cause and having been the victim of excessive force by one of the officers during the course of the arrest. The district court held a bifurcated trial, hearing first Mr. Heller's claims against the police officer responsible for the alleged excessive force. The jury found for the police officer. On that basis, the district court dismissed the case against the remaining defendants. The Ninth Circuit reversed, but the Supreme Court reversed the Ninth Circuit, noting that if the police officer "inflicted no constitutional injury on [Mr. Heller], it is inconceivable that [the remaining defendants] could be liable to [Mr. Heller]." *Heller*, 475 U.S. at 799. The court went on to state that "[i]f a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point." *Ibid.* (emphasis in the original).

In *Hancock*, 958 F.2d at 1375, we dealt with a similar situation. The wife of an arrestee brought a § 1983 action against the city of Lake Orion and a police officer, claiming, among other things, that a police officer had entered their home without a search warrant, in violation of the Fourth and Fourteenth Amendments. We held that the search was justified by exigent circumstances and that "[b]ecause the only city police officer present committed no constitutional violation, the city cannot be held liable." *Id*. at 1376.

Bowman argues that *Heller* is not controlling in this case, and that we should instead follow a line of Eighth Circuit cases that distinguish *Heller*, upholding direct municipal liability without finding a municipal employee liable in his or her individual capacity. Bowman points in particular to the recent case of *Speer v. City of Wynne*, 276 F.3d 980 (8th Cir. 2002), in which a city police officer brought a § 1983 action against the city and the mayor, alleging that the city's failure to conduct a name-clearing hearing prior to his termination violated his procedural due-process rights. A newspaper

article quoted the mayor concerning allegations that the officer had traded sex with suspects for favors, yet at trial several people recanted their earlier allegations, and the city eventually conceded that the allegations were false. The court held that the officer had a right to a name-clearing hearing in order to protect his liberty interest in his good name and reputation and that the city could not deprive him of that interest without due process, and thereby found the city liable. *Id*. at 984-85. Nevertheless, the court concluded that if the Mayor was not the city official who refused to give the officer the opportunity to clear his name, the Mayor was not individually liable. *Id*. at 987. The court distinguished *Heller*, stating:

> The outcome of the inquiry depends on the nature of the constitutional violation alleged, the theory of municipal liability asserted by the plaintiff, and the defenses set forth by the individual actors. We do not suggest that municipal liability may be sustained where there has been no violation of the plaintiff's constitutional rights as a result of action by the municipality's officials or employees. . . . However, situations may arise where the combined actions of multiple officials or employees may give rise to a constitutional violation, supporting municipal liability, but where no one individual's actions are sufficient to establish personal liability.

*Id*. at 986.

Ultimately, it is not necessary to choose between the Eighth Circuit's reasoning and our own in *Hancock*, following *Heller*, since they are entirely reconcilable. In *Speer*, the Eighth Circuit held that there must be a violation of the plaintiff's constitutional rights in order for liability to attach to either the individual defendants or to the municipal authority under § 1983. In *Speer*, the plaintiff's constitutional rights were violated, but not by the Mayor. Here, if we uphold the jury's findings as to Dr. Coble and Warden Myers,

there was no violation of Bowman's rights by anyone, even if CCA's policy implicitly authorized such a violation. The similarity between this case and *Heller* is that the constitutional violation claimed either occurred or did not occur as a direct result of the actions of at least one person, in this case Dr. Coble. This is not a scenario in which the "combined actions of multiple officials" could give rise to the violation at issue. For these reasons, we affirm the district court's denial of Bowman's motion for a judgment as a matter of law against the defendants in this case.

### B. Motion for a New Trial

Bowman argues that she is entitled to a new trial because the district court improperly admitted the testimony of four medical expert witnesses for the defense, erred in excluding the testimony of Father John Paris, and improperly allowed Warden Myers to testify in contradiction to an admission he made during a pretrial interrogatory and allowed him to testify as to his "habit" without having raised the issue prior to trial. We review all evidentiary rulings for an abuse of discretion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141 (1997); *United States v. Schreane*, 331 F.3d 548, 564 (6th Cir. 2003).

Bowman first contends that the defendants were improperly allowed to call four medical experts whose testimony she alleges was cumulative and redundant under Fed. R. Evid. 403. However, these witnesses possessed expertise in the distinct areas of hematology, pulmonary medicine and critical care, infectious disease, and pathology. These experts were used to rebut the testimony of Bowman's experts that Anthony could have died from various causes, including sickle cell anemia, a bacterial infection, or a pulmonary infection. Furthermore, the jury was instructed that the number of witnesses for one side was not to be considered in weighing the proof. District courts have wide discretion in managing the quantities of evidence admitted. The district

court did not abuse its discretion in allowing the defendants to call four medical experts in this case, all of whom testified as to different aspects of Anthony's care and medical condition.

Bowman's second claim, regarding the district court's decision to bar John Paris's testimony is also without merit. Before trial, Bowman identified two experts who were to testify as to the ethical impropriety of the contract between CCA and Dr. Coble. One, Dr. Howard Brody, was a licensed physician, while the other, Father John Paris, was a medical ethicist. At trial, Bowman decided to have Dr. Brody testify first.

After hearing Dr. Brody's testimony, the district court reconsidered its previous denial of the defendants' pretrial motion to exclude the testimony of both Dr. Brody and John Paris. Because Paris was not a physician, and his expert report "read like a lawyer's brief," the district court concluded that it was not appropriate for him to testify. Moreover, Bowman had already presented proof by a physician on the medical ethics of CCA's contract with Coble, and the court felt that Paris's evidence on this issue would be cumulative.

A district court is "free to exclude *any* expert testimony, including testimony of an announced expert, if the testimony is cumulative or redundant under Fed. R. Evid. 403." *In re Air Crash Disaster*, 86 F.3d 498, 527 (6th Cir. 1996). While we encourage the district court to make such rulings before the trial, as a last-minute decision made during trial can be disruptive to a party's strategy, we also cannot hold that in this case the district court's decision was an abuse of discretion. Furthermore, Bowman has not demonstrated how the exclusion of Paris's testimony resulted in substantial injustice to Bowman, and we will not disturb a discretionary decision on appeal unless it is unsupported in fact and results in substantial injustice to the aggrieved party. *McGowan v. Cooper Indus.*, 863 F.2d 1266, 1271 (6th Cir. 1988).

Bowman's third new trial issue deals with Warden Myers's testimony at trial, in which he stated that he did not "specifically recall" receiving Commissioner Campbell's telephone call, despite his response to a request for admission by the plaintiff, in which he stated "to the best of [his] memory and recollection" he *had* received such a call. Bowman contends that this testimony essentially circumvented his prior admission and is, therefore, grounds for a new trial. However, after this testimony was given, the district judge called the lawyers into a sidebar and at the end of that sidebar, the following testimony was given:

Q    Warden Myers, just so there is no confusion, you do agree or admit that Warden – or excuse me, that Commissioner Campbell apparently called you on January the 2nd, 1996?

A    I will admit to that.

In addition, on cross-examination, Bowman's lawyer led Myers through his pretrial admissions. The district court ultimately ruled that Myers was bound by his response to the specific request for admission and so instructed the jury. The judge's corrective action rendered any error harmless. We will only reverse the district court's judgment if the error was not harmless. *United States v. Carter*, 969 F.2d 197, 201 (6th Cir. 1992).

Myers also testified that there was an "informal procedure" for dealing with phone calls received from "outside sources" such as Commissioner Campbell. Bowman argues that this testimony regarding Myers's habits should not have been admitted since it was not raised prior to trial and since the defendants did not establish a "degree of specificity and frequency of uniform response" in order to ensure that it was truly a habit. Bowman also argues that this evidence was prejudicial since it created a false impression in the minds of

the jury that Myers had in fact taken action in response to the phone call from Commissioner Campbell.

We reject Bowman's arguments. First, Bowman did not object to the admission of what she describes as "habit" testimony by Myers at trial. Bowman has, therefore, waived any objection she may have had to such testimony. Fed. R. Evid. 103 (error may not be predicated upon a ruling that admits evidence "unless a substantial right of the party is affected, and . . . a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context."). *See also American Anodco, Inc. v. Reynolds Metals Co.*, 743 F.2d 417, 424 (6th Cir. 1984).[5] We, therefore, review only for plain error pursuant to Fed. R. Civ. P. 52(b), which allows us to consider a plain error that affects the substantial rights of the party, even if it was not brought to the court's attention. There is no such error here. Habit evidence is entirely admissible under Fed. R. Evid. 406, which states in relevant part: "Evidence of the habit of a person . . ., whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person . . . was in conformity with the habit."

Bowman contends that the district court erred in admitting this evidence and relies on a Seventh Circuit case for the proposition that before a court may admit habit evidence, the offering party must establish a degree of specificity and frequency of posited response. *See Simplex, Inc. v. Diversified Energy Systems*, 847 F.2d 1290 (7th Cir. 1988). However, *Simplex* dealt with a particular subset of habit

---

[5]Bowman states in her Reply Brief at 33 that she did object to "the admission of Myers' 'habit' testimony." However, we find no such objection on the record. Instead, Bowman objected to the entirety of Myers's testimony, stating that it was an attempt to "get around" his prior admission.

evidence that is not present in Myers's testimony. In *Simplex*, a supplier had brought an action against its purchaser, alleging anticipatory and actual breach of various contracts. The purchaser answered and counterclaimed, asserting breach of agreement by failing to meet contract specifications. During the subsequent trial, the purchaser sought to introduce evidence of the supplier's allegedly routine practice of "late deliveries and defective performance pursuant to Rule 406." The district court excluded this evidence and the Seventh Circuit affirmed that decision on review, recognizing that such evidence was likely to conflict with Fed. R. Evid. 404, which expressly prohibits the admission of prior bad acts used to establish a party's propensity to act in conformity therewith, except under narrowly prescribed circumstances. The court in *Simplex* held that, under these circumstances, "before a court may admit evidence of habit, the offering party must establish the degree of specificity and frequency of uniform response that ensures more than a mere 'tendency' to act in a given manner, but rather, conduct that is 'semi-automatic' in nature." *Id.* at 1293. The testimony offered by Myers does not conflict with Rule 404 and is not otherwise so prejudicial as to outweigh its probative value under the circumstances. The district court did not commit error in allowing it to be admitted. We therefore affirm the district court's denial of Bowman's motion for a new trial.

### III

#### *The Injunction*

CCA contends that the district court's holding that its medical policy is unconstitutional should be reversed for three reasons. CCA argues that the district court: 1) did not have jurisdiction to issue injunctive relief since it confronted no live "case or controversy"; 2) was precluded from awarding injunctive relief by the Prison Litigation Reform Act of 1996, 18 U.S.C. § 3626 (PLRA); and 3) erred in finding that CCA violated its Eighth Amendment duty to Anthony. We need

only look at the first argument, for this issue is clearly moot as a result of Anthony's death, and Bowman has no standing to request injunctive relief.

### A. Mootness

The district court noted that because Anthony had died, "it is clearly arguable that any claim for injunctive relief is moot." Nevertheless, the district court resolved this issue in favor of Bowman, stating in relevant part:

> [E]xceptions arise for the type of important legal issue that is "capable of repetition, yet evading judicial review," *Kremens v. Bartley*, 431 U.S. 119, 133 (1977), or involves a class action. *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991). Here, this is a rare case in which a prisoner is represented by counsel on a constitutional issue of the dimensions raised here. Moreover, although this is nominally not a class action, there was class type proof introduced on the effects and impact of CCA's medical policy. Given the extensive resources devoted to this litigation, the Court concludes that this case represents exceptional circumstances that warrant consideration of the constitutionality of this important medical policy that continues to operate at SCCF.

The district court's position is not convincing. "The test for mootness is whether the relief sought would, if granted, make a difference to the legal interests of the parties." *McPherson v. Michigan High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 458 (6th Cir. 1997) (en banc) (internal quotations and citations omitted). In this case, an injunction has no impact on Bowman's legal interests.

Given the fact that Anthony is dead, any claim for injunctive relief is moot, and the district court improperly relies on *Kremens* and *Riverside* in an attempt to avoid this

inevitable result. *Kremens* was a class action suit in which teenagers between the age of 15 and 18 years old were the named plaintiffs challenging the constitutionality of a Pennsylvania statute governing the voluntary admission and voluntary commitment of persons 18 years of age and younger to state mental institutions. As a result of a change in the law, which was immediately applicable, mentally ill juveniles 14 years of age and older were, in essence, treated as adults, thereby rendering the claims of the named plaintiffs moot on appeal. Nevertheless, the Court held that the case could be heard, relying on the fact that "[i]n particular types of class actions this Court has held that the presence of a properly certified class may provide an added dimension to our Art. III analysis, and that the mootness of the named plaintiffs' claims does not 'inexorably' require dismissal of the action." *Kremens*, 431 U.S. at 129-30. However, the Court specifically noted that "[i]f the only appellees before us were the named appellees, the mootness of the case with respect to them would require that we vacate the judgment of the District Court with instructions to dismiss their complaint." *Id*. at 129. Although Bowman's case could conceivably lend itself to pleading as a class action, we cannot change the posture of the case in this appeal. The other case that the district court relied on, *Riverside*, is yet another class action, and the same reasoning can be applied. In fact, the Court very clearly stated that its "cases leave no doubt . . . that by obtaining class certification, plaintiffs preserved the merits of the controversy for our review." 500 U.S. at 51. Any claims for injunctive relief by Bowman, the only plaintiff in this case, have been rendered moot and there are no class members to preserve those claims. Thus, we must reverse the district court's grant of an injunction.

### B. Standing

Although standing is a related issue, it is analyzed separately, and in this case creates an additional ground for overturning the district court's injunction. Federal courts are

only empowered to adjudicate "cases" or "controversies." U.S. Const. art. III, § 2. Accordingly, Bowman must have a "concrete private interest in the outcome of the suit." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573 (1992). To possess standing for the award of an injunction, even though she never asked for one, Bowman must show that 1) she has suffered an "injury-in-fact" that is concrete, particularized, and actual or imminent; 2) the injury is fairly traceable to the conduct of the defendants; and 3) the requested relief would likely redress the injury suffered. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180-81 (2000). Bowman cannot meet the third requirement of this test with respect to injunctive relief, since enjoining Dr. Coble's contract with CCA will not affect her in any way and will certainly not redress the alleged injury.

Bowman argues that the Supreme Court's decision in *Helling v. McKinney*, 509 U.S. 25 (1993), provides a basis for the district court's injunction. In *Helling*, a prisoner brought a civil rights action against various prison officials, alleging a violation of the Eighth Amendment due to his exposure to tobacco smoke. Although the Court of Appeals held that the defendants were immune from liability for damages under § 1983, the Supreme Court nevertheless found that McKinney, the prisoner, had stated a valid Eighth Amendment claim on which prospective relief could be granted through an injunction, by alleging that his compelled exposure to smoke posed an unreasonable risk with respect to his future health. The defendants argued that unless McKinney was able to prove that he was currently suffering serious medical problems caused by exposure to smoke, there could be no violation of the Eighth Amendment. However, the Supreme Court held, as it has before, that the Eighth Amendment protects against future harm to inmates, noting that "[i]t would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them." *Id*. at 33. While this case would have been relevant if

Anthony were still alive or if there had been other prisoners who were parties and would still have been subject to the medical policy at issue in this case, that is not the situation here, and thus *Helling* is not applicable.

### *Attorney's Fees*

Bowman petitioned for an award of attorney's fees under 42 U.S.C. § 1988 as a prevailing party in a § 1983 case. The district court awarded Bowman attorney's fees and costs pro-rated for the grounds on which she had "prevailed." Since we now reverse the sole ground on which Bowman succeeded, Bowman is no longer entitled to an award of attorney's fees or costs, as she is no longer a "prevailing party" for purposes of the statute. *See* 42 U.S.C. § 1988; *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). The district court's award of attorney's fees and costs should therefore be reversed.

### IV

For the reasons given above, we AFFIRM the district court's denial of Bowman's motion for judgment as a matter of law or a new trial. We REVERSE the district court's holding with respect to the unconstitutionality of CCA's medical policy, along with the injunction awarded on that basis, since this issue is moot for Bowman and she has no standing upon which to bring such a claim for prospective relief. Finally, we REVERSE the district court's award of attorney's fees to Bowman, as Bowman is no longer the prevailing party.