**Dalburn FRANKLIN, Plaintiff–Appellant,**

v.

**Arthur MESSMER and Metropolitan Government of Nashville and Davidson County, Tennessee, Defendants–Appellees.**

No. 03–5184.

United States Court of Appeals,
Sixth Circuit.

Sept. 14, 2004.

Rehearing En Banc Denied
Nov. 10, 2004.

Before SILER, COLE, and ROGERS, Circuit Judges.

R. GUY COLE, Jr., Circuit Judge, dissenting.

PER CURIAM.

Plaintiff Dalburn Franklin appeals the jury verdict in favor of Defendant Officer Arthur Messmer on his excessive force claim and the district court's dismissal of his malicious prosecution claim. Franklin further appeals the grant of summary judgment to Defendant Metropolitan Government of Nashville and Davidson County, Tennessee ("Metro"), in which it dis-posed of his failure-to-supervise claim. We AFFIRM.

## BACKGROUND

In August 1998, Franklin and Cheryl Brdar had a late dinner at a Nashville restaurant. After exiting the establishment, Franklin attempted to throw an empty cigarette package into a trash can outside. Officer Messmer, who was standing outside the restaurant, saw that Franklin missed the trash can and asked him to pick up the wrapper. Instead, Brdar picked up the wrapper, at which time Messmer insisted that Franklin pick it up and throw it away. Franklin, who replied that Brdar had already picked it up, continued to walk away. Messmer grabbed Franklin by his shirt; when Franklin yanked his arm away, his shirt ripped off. Messmer then shot pepper spray into Franklin's eyes; however, some of the spray ricocheted into Messmer's eyes. Having seen that Messmer was incapacitated, other police officers who were congregated around the restaurant arrested Franklin. Franklin attested that the other officers tackled him, beat him, and held his face to the ground while Messmer again shot pepper spray into his eyes. Franklin was charged with littering, disorderly conduct, resisting arrest, and assault. A grand jury later refused to indict Franklin and issued a "No True Bill."

Franklin brought suit pursuant to 42 U.S.C. § 1983, alleging that (1) Metro failed to supervise its officers and maintained a policy of tolerating excessive force by its officers; and (2) Messmer administered excessive force during the arrest. While Metro was granted summary judgment, Messmer was not and the matter proceeded to a jury trial. The jury returned a verdict in Messmer's favor.

## DISCUSSION

■ Franklin first argues that the district court erred in excluding evidence of Messmer's prior conduct. Franklin wished to introduce evidence, such as a disciplinary complaint, that Messmer had engaged in excessive force in the past, including his use of pepper spray. *See* Fed.R.Evid. 404(b). We review this evidentiary decision for an abuse of discretion. *See United States v. Hilliard,* 11 F.3d 618, 619 (6th Cir.1993).

There was no abuse of discretion, as the district court excluded Franklin's proffered evidence because it was neither probative nor relevant. *See Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) ("[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.") (citations omitted). As Franklin wanted to enter Messmer's prior conduct to demonstrate his underlying intent in arrests, i.e., his propensity for excessive force, the evidence was properly excluded. *See Bowman v. Corr. Corp. of Am.,* 350 F.3d 537, 549 (6th Cir.2003) (although no error in admitting evidence, court recognized that Fed.R.Evid. 404 precludes admission of prior bad acts if used to establish propensity). Similarly, the district court did not abuse its discretion in refusing to grant Franklin a new trial since the jury properly resolved his excessive force claim in Messmer's favor. *See Holmes v. City of Massillon,* 78 F.3d 1041, 1045 (6th Cir. 1996) (no "definite and firm conviction" that the district court "committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors[ ]") (citation omitted).

■ Franklin next argues that the district court erroneously dismissed his state law malicious prosecution claim against Messmer prior to trial. Specifically, the district court ruled that Franklin was estopped from denying that probable cause existed for his arrest. *See* Fed.R.Civ.P. 12(b)(6). We review the district court's dismissal of this claim *de novo. See Cavin v. Honda of Am. Mfg., Inc.,* 346 F.3d 713, 727 (6th Cir.2003).

The district court properly dismissed Franklin's malicious prosecution claim. Even though Franklin was not indicted, during his preliminary hearing in state court a general sessions judge found probable cause to bind his case over to the grand jury. Since Franklin "had a full and fair opportunity to litigate whether probable cause existed to maintain [the] . . . charge[s] against him, he is barred from relitigating that issue in this § 1983 action." *See Smith v. Thornburg,* 136 F.3d 1070, 1077 (6th Cir.1998) (footnote omitted) (identical facts and result as case *sub judice* ).

■ Franklin lastly argues that the district court erred in granting Metro summary judgment on his failure-to-supervise claim, insisting that Metro failed to properly supervise Messmer due to his propensity for excessive force. We review the district court's grant of summary judgment *de novo. Lautermilch v. Findlay City Schs.,* 314 F.3d 271, 274 (6th Cir. 2003). "Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Id.; see* Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Summary judgment was appropriate. Messmer completed his police academy training, which included the use of force and, specifically, the use of pepper spray.

Metro employs an "Early Warning System" to identify problem police officers who have a propensity to create situations where excessive force is required. Messmer never triggered this "Early Warning System" and there were no complaints against him for excessive force, including his use of pepper spray. Accordingly, Metro engaged in no deliberate indifference. *See Berry v. City of Detroit,* 25 F.3d 1342, 1346 (6th Cir.1994).

AFFIRMED.

COLE, Circuit Judge, dissenting.

Because Franklin was denied a fair chance to prove that Messmer applied excessive force, and because the district court erroneously prevented Franklin's claims of malicious prosecution against Messmer and failure to supervise against the City, I respectfully dissent.

### A. *Evidentiary Restrictions*

Obliged to convince the jury to believe his narrative, Franklin sought to introduce two types of evidence that would have cast doubt on Messmer's explanation of the events: (1) complaints of harassment filed with the Nashville Police Department against Messmer by Lovella Lyons and William Lowe; and (2) evidence of Messmer's prior uses of force, including his use of pepper spray. Each would have undermined Messmer's testimony; both were wrongly excluded.

#### 1. Prior complaints

During trial, the defense repeatedly highlighted that Messmer had no motive to use excessive force against Franklin, suggesting to the jury that Franklin's explanation was improbable and therefore unworthy of belief. While cross-examining Franklin, Messmer's counsel asked him "Now it's your testimony that Officer Messmer reached over and grabbed your shirt, yanked it off your body for absolutely no reason?" He then asked Franklin to confirm that "[H]e sprayed you for no reason at all?" Similarly, when Messmer testified, his counsel asked him about Franklin's allegation that Messmer stopped at a convenience store and showed off his "trophy"—Franklin—to another officer. Counsel asked Messmer "Is that something you would do?", to which Messmer unsurprisingly responded "No, sir."

The implication of counsel's questioning, of course, was that Messmer would have had no reason to act as Franklin alleged. The evidence of complaints from Lyons and Lowe, in contrast, would have demonstrated that Messmer equated lawful protestations with illegal activity, and would have supplied Messmer's motive to retaliate against someone like Franklin, who had lawfully challenged Messmer's authority. First, on February 15, 1994, the City sustained a complaint against Messmer brought by Lovella Lyons, finding that "[o]n March 3, 1993, Officer Messmer initiated a confrontation with [ ]Lyons which ultimately led to her arrest. He persisted in seeking further retribution against her once those charges had been disposed of." According to Messmer, he arrested Lyons because "[s]he was raising her voice screaming, yelling." Messmer subsequently made several attempts to have Lyons evicted from her housing development, and "[a]ccording to management personnel, [Messmer] became more demanding, and, on occasion, visibly upset that [his] request had been denied." Moreover, "[police] [i]nvestigation revealed that during the weeks following the arrest, [Messmer] approached Ms. Lyons on several occasions and attempted to provoke her to react."

Second, according to Nashville resident William K. Lowe, on August 29, 1997, he and his family were driving in Nashville

and passed Messmer's police cruiser, which "was displaying a personal license plate on the front of the car that read (in reverse, so as to see it in your rear view mirror) 'YOUR [*sic*] BUSTED.'" The letter stated that Lowe pulled up alongside Messmer and told him that the license plate's message was inappropriate, at which point Messmer "became very negative in his demeanor, rolled up his window, and drove away." Messmer, according to Lowe, subsequently followed him for three miles, and issued him a trumped-up speeding ticket. Because this evidence would have demonstrated that Messmer took offense to citizens' lawful challenges to his authority, it would have illustrated to the jury that Messmer did indeed have a motive to act as Franklin alleged, and would have put in context otherwise improbable actions. Instead, the defense was able to disparage Franklin's statement because it provided no explanation of Messmer's motive.

Finally, in relying on *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)—which held that an officer's subjective intent is irrelevant to whether his conduct violated the Fourth Amendment, *id.* at 399, 109 S.Ct. 1865— the district court misread the rule that *Graham* set forth. *Graham* addressed only the *legal* significance of a given set of facts; it held that if the facts did not indicate that the officer's force was objectively unreasonable, his subjective state of mind would not change its legality. In our case, in contrast, Franklin was not arguing that Messmer's state of mind affected the ultimate legal determination; rather, he sought to use evidence of Messmer's state of mind to convince the jury to believe one set of facts (asserted by Franklin) over a different set of facts (asserted by Messmer). *Graham* explicitly endorsed the use of evidence in this fashion: "Of course, in assessing the credibility of an officer's account of the circumstances that prompted the use of force, a factfinder may consider, along with other factors, evidence that the officer may have harbored ill-will toward the citizen." *Graham,* 490 U.S. at 399 n. 12, 109 S.Ct. 1865. The district court missed this distinction, and Franklin's case suffered for it.

### 2. Prior use of pepper spray

Messmer also testified that pepper spray was a worthy substitute for other uses of force, and that he "prefer[red] to use pepper spray in lieu of an impact weapon." If this were the case, one would expect that Messmer's total uses of force would have been roughly the same both before and after the City approved the use of pepper spray; the spray would have replaced a more invasive alternative.

The actual statistics, however, demonstrated that although Messmer used force a total of six times in the *five years* prior to the City's introduction of pepper spray, he used force six times in the just over a year since the use of pepper spray was authorized (and he used pepper spray in each of those incidents). This evidence suggests that Messmer was not just using pepper spray in lieu of other types of force, but sometimes was using pepper spray in lieu of not using force at all. Once Messmer opened the door by claiming that he used pepper spray as a mere substitute for other types of force, the exclusion of this evidence deprived Franklin of the opportunity to impeach Messmer on this point.

### B. Malicious Prosecution

Relying on *Smith v. Thornburg,* 136 F.3d 1070 (6th Cir.1998), the district court held, and the majority now agrees, that Franklin was estopped from pressing his malicious prosecution claim against Mess-

mer. The district court believed this to be so because a state court had already determined, during the preliminary hearing following Franklin's arrest, that the state had probable cause to proceed. *Smith*, however, is inapposite. There, the state court had rejected a *legal* defense submitted by the defendant: "at the conclusion of the hearing, plaintiff's counsel moved to dismiss the assault charge asserting that the use of force in defense of plaintiff's property was justified under [Tennessee law.] Despite plaintiff's reliance on [Tennessee law], the court ruled that probable cause existed to bind over the assault charge to the grand jury." *Id.* at 1077. Thus, *Smith* held simply that a party may not relitigate a legal question identical to the one that had already been litigated and decided.

Unlike in *Smith*, the theory underlying Franklin's claim of malicious prosecution—that Messmer was lying, and had fabricated the charges—was never disposed of by the state court. Instead, the state court expressly declined to resolve this factual question, stating that "we just got two different stories here, and a jury's going to have to determine who to believe." In other words, the state court found that a factual dispute existed, and recognized that if Messmer won the factual dispute, he would have been able to establish probable cause. Yet the relevant question to be decided—who should be believed, Franklin or Messmer?—had never been litigated. (It's as if Messmer survived a motion for summary judgment, but had not prevailed at trial.) Unlike the plaintiff in *Smith*, Franklin never received any chance—let alone a chance that was full and fair—to litigate the question of probable cause.

## C. *Municipal Liability*

Finally, the record would have allowed a reasonable jury to find that the City failed to supervise its officers. A municipality's failure to train may result in constitutional liability "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 387, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). The majority believes that the City is off the hook because it subjects its officers to a wide array of training in the use of force, and also because it institutes an "early warning system." While these programs exist, sound good on paper, and may have had some salutary effect, there is other evidence in the record that the City ignored the real possibility that its police officers were abusing their pepper spray privileges.

Franklin points to statistics which demonstrated—as to Messmer specifically and the police force generally—that the introduction of pepper spray into the police officers' arsenal resulted in a significant increase in the total uses of force. In rejecting Franklin's reliance on these statistics, the district court concluded, and the City now argues, that "[t]he alleged increase in the uses of force ... reflects merely a change in the reporting of uses of force." This assertion, though superficially appealing, misunderstands the statistics. It is true that with the Department's introduction of pepper spray came the requirement that all uses of pepper spray be reported. But the subsequent conclusion—that the statistics reflected only a change in reporting, not a change in actual use—would suffice only if the use of pepper spray had *always* been legal and the City simply added the requirement that the use of pepper spray be reported. Here, in contrast, there had never been pepper spray use unaccompanied by reporting. Any increase in the reported use of force, therefore, would have reflected an actual increase in the use of force.

How big an increase? Following the introduction of pepper spray, overall use of force by the City's police officers increased by forty to fifty incidents per month. (And as I noted above, Messmer's statistics mirrored this trend.) Thus, the City's rationale—that the introduction of pepper spray allowed officers to restrain hostile individuals with less dangerous means—defies the evidence. Moreover, the use of other types of force decreased by only about six incidents per month following the introduction of pepper spray, belying the City's claim that the use of pepper spray would result in markedly fewer uses of more dangerous force.

Of course, another inference from the large increase in the overall use of force following the introduction of pepper spray is that prior to the allowance of pepper spray, the officers were taking too many risks with their own safety. It may have been that there were hundreds of incidents each year in which a police officer used, say, wrist control or verbal commands when even greater force was necessary. And the City might have further supported that inference by introducing evidence about the number of excessive force complaints that had been filed since pepper spray was introduced. On summary judgment, however, we are required to give all inferences to the nonmoving party, Franklin.

In any event, the City's failure to investigate the increased use of force by its officers was itself a dereliction of its responsibilities: it was confronted with data that revealed (at the very least) a potential problem and chose to assume that everything was just fine. A reasonable jury could have concluded, therefore, that the City's lack of response to the new data constituted a deliberate indifference to the protection of its citizens from the excessive use of pepper spray by its police officers.